## CLAUDE F. DOBBS ET AL. *vs.* STATE OF MARYLAND.

*Criminal Law—Evidence of Other Crime.*

That on a prosecution for a murder committed during a robbery by defendants, evidence of another robbery by them was admitted, *held* ground for reversing a judgment of conviction.

*Decided April 9th, 1925.*

Appeal from the Criminal Court of Baltimore City (GORTER, C. J., STANTON and FRANK, JJ.).

Criminal proceeding against Claude F. Dobbs, George Gross, Thomas J. Foran, alias Thomas James Farren, and Charles Mullen, alias Joseph Green. From judgments of conviction, defendants appeal. Reversed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Robert R. Carman,* for the appellant Claude F. Dobbs.

*Leonard Weinberg,* with whom was *Howard A. Sweeten* on the brief, for the appellant Thomas Foran.

*Ellis Levin,* for the appellant Charles Mullen.

*Herbert Levy, Assistant Attorney General,* and *Herbert R. O'Conor, State's Attorney for Baltimore City,* with whom were *Thomas H. Robinson, Attorney General,* and *Eugene A. Edgett* and *J. Bernard Wells, Assistant State's Attorneys for Baltimore City,* on the brief, for the State of Maryland.

A *per curiam* opinion was filed as follows:

There being, in the opinion of a majority of the Court, error in the rulings involved in the exceptions in this case, relating to the Littman robbery, numbered forty to fifty-nine, inclusive, it is by the Court of Appeals of Maryland this 9th day of April, 1925,

*Ordered*: That the judgments against each appellant in this case be and the same are hereby reversed and the case remanded as to each for a new trial.

OFFUTT, J., filed the following separate opinion, in which ADKINS and DIGGES, JJ., concurred, and WALSH, J., concurred in part:

Because of the serious character of this case and the importance of the principles involved, I feel constrained to state at some length the reasons which led me to concur in the *per curiam* order of this Court.

At about half past three o'clock in the afternoon on Tuesday, May 13th, 1924, a touring automobile was standing at the curb in front of the jewelry store of Louis Cohen, 728 East Baltimore Street, in Baltimore City. The front of that store has two windows facing on the north side of Baltimore Street, one on either side of a door. At or about that time two men were discovered in front of that store, one at each window. One of these men thrust some hard instrument, supposed to be an iron bar wrapped in paper, against one of these windows, broke the glass, and seized a quantity of the jewelry displayed in it. Cohen, who was in the store, hearing the noise, rushed out and approached the man with the jewelry. The man at the other window, who had a pistol, then shot Cohen in the hand, and, as Cohen continued to advance, the man with the pistol shot again and killed him. The two men then entered the waiting automobile in which there was a third man, the chauffeur, and it was driven rapidly west along Baltimore Street to the Fallsway, thence north on the Fallsway, and later an automobile having the same license number, "of a sort of maroon color," was found

abandoned at the corner of Chase Street and Homewood Avenue.

On May 16th, Thomas J. Foran was arrested in Philadelphia, and Claude F. Dobbs, George Gross, and Charles Mullen were on May 22nd arrested at Fredericksburg, Virginia. These four men were brought to Baltimore, where on June 2nd they were indicted for the murder, and on that indictment they were tried and convicted in the Criminal Court of Baltimore City. A motion for a new trial filed on behalf of each of the traversers was overruled, and Gross, Dobbs, and Foran were each sentenced to death, and Mullen to be imprisoned for life in the Maryland Penitentiary. After that judgment had been entered the traversers filed a petition for a writ of error *coram nobis* on the ground that Mrs. Herman Caples, a material identification witness for the State, had committed perjury, and filed a number of affidavits in support of that petition. On the State's motion, the court refused to consider that petition or the accompanying affidavits, and from that order and the several judgments in the case against them the traversers have appealed.

The record contains one hundred and twenty-two exceptions, of which twenty-one have been abandoned by the appellants. Most of the remaining exceptions fall naturally into groups and may be discussed under three heads, which are (1) the opening statement of the State's attorney, (2) the admission in evidence of certain statements offered as confessions against one or more of the traversers, and (3) the admission of evidence concerning other crimes not related to or connected with the crime charged in the indictment.

Before dealing particularly with these exceptions, in order to show their significance, I will refer in somewhat general terms to facts which may be inferred from the evidence to which they relate, and the purpose for which it was apparently offered.

The traversers were known to the police before the Cohen murder, and indeed even then Gross, Dobbs, and Foran were

wanted on other charges. Up to that time much of the
short span of their lives had been spent in violating the law,
in undergoing punishment for such violations, or in endeav-
oring to evade it. They appeared to have had no fixed occu-
pation, and they seem to have been regarded with well
founded suspicion by the police and their photographs appear
to have been in their hands. Three of them, Gross, Dobbs,
and Mullen, lived in Baltimore and Foran in Philadelphia.
Two of them, Dobbs and Foran, had been confined at St.
Mary's Industrial School at the same time, and all of them
were acquainted before the 13th of May, 1924.

Shortly after the murder, Benny Zublouski, a twelve-
year-old newsboy who witnessed the crime, was shown by
the State's attorney about fifty photographs of young men,
and out of that collection he said that he recognized two
photographs, those of Gross and Dobbs, as pictures of the
two men who had robbed the Cohen store and committed
the murder. Later a similar collection was shown to Ernest
Homberg, who was also present when the crime took place,
and he picked out the photograph of Foran as a picture of
the man who drove the car. No witness who was present
when the crime was committed identified Mullen as present
on that occasion, but on the contrary they all testified that
they saw but three persons engaged in it, of whom one re-
mained in the car whilst, of the other two, one broke the
window and seized the jewelry while the other shot and
killed Mr. Cohen.

No part of the stolen property was found in the posses-
sion of any of the traversers, traced to them or in any way
accounted for, nor was any weapon or other article identi-
fied as having been used in the commission of the crime or
in the possession of the criminals who committed it found
in the possession of the traversers or traced to them.

Under such circumstances, it was incumbent upon the
State to show (1) by the testimony of persons who wit-
nessed the crime that the traversers committed it, or (2)
that they themselves admitted that they had committed it,

or (3) circumstances which would support a rational inference of their guilt.

To meet that burden the State's testimony was in the main directed, first, to the identification of the traversers as persons actually seen while engaged in the crime; second, to showing that they were in Baltimore at a time when they could have committed it, and, third, to showing that they confessed that they had committed it.   And we will briefly refer to so much of the testimony as is relevant to those issues.

Four eyewitnesses of the crime testified that one or another of three of the traversers, Gross, Dobbs, and Foran, was present when the crime was committed; no one of them saw Mullen there at that time.   The first identification witness called was Mrs. Herman C. Caples, of Stevenson Station, in Baltimore County.   She testified that she was crossing from the south to the north side of Baltimore Street opposite the Cohen store when she heard the crash of the broken glass, and saw a man "robbing jewelry out of a window."   That she continued directly towards the store, and as she reached the "north car track" she heard a shot, and still walking directly towards the bandits she heard a second shot as she reached the curb, and the falling man "brushed" her shoulder.   She identified Gross, who she said was wearing a brown pin-striped suit, with a lighter cap, and brown shoes, as the man who broke the window, and Dobbs, who was she said dressed in blue, as the man who killed Mr. Cohen.   She said that the man in the brown suit broke the window with "something wrapped in blue" which tinkled when it fell to the pavement.   This witness, who was, at the time when she witnessed the crime, in a highly hysterical condition, had in 1921 been taken by an uncle for a thirty days' visit from an "asylum for the feeble-minded" in New Jersey where she had been confined for three years, and "she never went back because she did not belong in that state."

Benny Zublouski, aged twelve, a newsboy, was at the corner of Front and Baltimore Streets when "it all happened." He testified that he saw two men in front of the Cohen store, and that he saw one of them, dressed in brown and wearing light gloves with black arrows on the backs, break the window with an iron bar wrapped in yellow paper, and that he saw a man dressed in blue shoot Mr. Cohen, and he identified Dobbs as the man in the brown suit who broke the window and Gross as the man in the blue suit who shot Mr. Cohen. He further said that after the shooting the two men got in a waiting automobile in which there was a third man and were driven away. That he only saw three men in the automobile and that he could not say that Foran was the third man. He described the automobile as black or dark blue in color and gave its license number.

Carroll Peterson, a waiter in a restaurant at 726 East Baltimore Street, said that he heard the window break, walked to the front and saw two men getting in an automobile. That one of them, whom he identified as Dobbs, dressed in blue, had a pistol in his hand which he was pointing at the witness and the crowd, and that there were about twenty people there. That the automobile was a Chevrolet of a faded dark blue color, and he only saw three persons in it. He said that the pistol which he saw was a thirty-eight army pistol.

Ernest F. Homberg, a vocational school teacher, was walking west along the south side of Baltimore Street at the Fallsway, and was about ten feet from the southwest corner of Baltimore Street and the Fallsway when he heard two shots. He thought they were automobile noises and may have gone a few steps further, when he turned and looked east and saw a man fall on the pavement, and then suddenly he saw an automobile turn the corner of Baltimore Street and the Fallsway with three men in it, one of whom he "thought" was standing on the running board, and he identified Foran as the driver of that automobile, which he said was a weatherbeaten car of a faded olive green color. When

asked if he could identify the man on the running board he said, pointing to Dobbs, "I think that that there—— I am not sure—— I won't be positive of this, but I think that is him there." He first said that the man was on the left running board and then changed his testimony and said that he was on the right running board, and when asked how certain he was that it was Dobbs who was on the running board he said: "Well, to come right out—down—I can't say just exactly that I would just swear on a stack of Bibles that he was." He was unable to say how that man was dressed, whether he wore a cap or whether what he thought was hair was a hat or whether he had anything on his head. He further said on his cross-examination that he could identify the driver of the car by the expression of his face and of his eyes, although he could not see what color they were, nor was he able to say how he was dressed. He too said that he only saw three men in the automobile when it turned the corner.

It will be noted that three persons identified Dobbs, Mrs. Caples and Peterson, who said he was dressed in blue, and that he shot Mr. Cohen, and Benny Zublouski, who said that he was dressed in brown and that it was he who broke the window; that two persons identified Gross, Mrs. Caples, who said he was dressed in a brown suit, and that he broke the window, and Benny Zublouski, who said that he was dressed in a blue suit and that it was he who shot Mr. Cohen; that one person, Homberg, identified Foran as the driver of the car, by the expression of his eyes and face, although he did not know how he was dressed, and was so far away that he was unable to distinguish between the hat and the hair of a man on the running board of the car and he only saw him as he turned the northeast corner of the Fallsway and Baltimore Street, in a rapidly driven automobile, the witness being near the southwest corner of those two streets.

The State, anticipating that the defendants would undertake to establish an alibi, as part of its case in chief, undertook to show that the four traversers were in Baltimore

when the murder was committed. It was conceded that the four were together in Wilmington, Delaware, on the morning of May 13th, and the theory of the State seems to have been that they left Wilmington in time to arrive in Baltimore at 12.50 P. M.; that between that time and 3.20 o'clock P. M. they "perfected their plans" for the crime, procured food, stole an automobile, proceeded to the Cohen store, and committed the robbery and murder and then drove to Homewood and Chase Streets, where they abandoned the automobile, and from there walked to Union Station, where they arrived in time to take the four o'clock train for Philadelphia, where they arrived at about six o'clock.

To prove that the defendants were in Baltimore on the day the crime was committed two witnesses were called, Fannie Caplan and Rudolph Timmerman. Timmerman had a grocery store at Wilkens Avenue and Payson Street, and he testified that on either the 12th or the 13th of May, at about half past one or a quarter of two Mullen, one of the defendants, bought a couple of pounds of pork steak from him at his store. When pressed to say whether it was the 12th or the 13th, the witness was apparently unwilling to commit himself definitely to either date. He said: "Well, I think it was on the 13th, but I couldn't say——but I think it was on the 13th. * * * Yes, I think it was on the 13th of May. I think it was, but I could not say for sure. It was on the 12th or 13th, I know that, * * * that he fixes it as the 13th because he bought it on the 12th; that every Monday he buys it; that the Monday before that they had a small piece and they roasted that whole piece, didn't sell any of it at all; that he is the fellow that the detectives came around to see and tried to get him to sign a statement, but he didn't sign nothing; that he would not sign anything because he could not say for sure."

Fannie Caplan testified that at about one-thirty or a quarter of two on the day of the murder she was sitting on a box outside her father's grocery store, which was oppo-

site the Timmerman store, when she saw a shabby looking
five-passenger automobile drive up. That three young men
about eighteen, nineteen or twenty years old left the car,
and a fourth who remained. in it drove it away. That the
three men who left walked down an alley very close to her
and made some remark to her as they passed. Those men
she identified as Foran, Mullen and Dobbs, while she iden-
tified the fourth man who drove away in the car as Gross.
That she did not mention it to anyone that she had seen
the men or boys until she was interviewed by Detective
Roche on or about June 2nd. That her father had hired a
Mrs. Myerwitz on May 27th; "that after her father hired
Mrs. Myerwitz witness would go down and help her and let
her eat her lunch at her daughter's house; that it was be-
fore that day she saw in the paper those pictures; that the
27th of May was exactly two weeks after the murder; that
it was in those two weeks that she first came to realize that
these were the boys; that she could not tell how long before
the 27th; that the first thing she did when she did realize
it was she just looked at them and said, 'Oh, leave it go by,
I don't know whether they were really murderers or not. I
just saw it in the paper'; * * * that she first began to think
they were when she saw the pictures in the papers; that
when she saw the pictures in the papers and thought they
were the men she did not mention it to any soul in the world,
did not have time to; that she was not going around gab-
bing all day long, she stayed in the store; that the people
that came in the store told her about it, but what could she
do, she could not get the murderers, she told them it is ter-
rible; that one Jewish customer came in and said, 'Fannie,
what do you think about the murder?' and I said, 'What
can I think about it? He is killed, that is all'; * * * that
after she knew in her breast and in her mind was the
knowledge that these were the boys and that those boys had
passed her place on the day of the murder. She never told
that to a living soul because she did not want to get in the
trial, because she had no time, and she knew that if she

would say something they would gabble all around, they would say she knew something about this murder and then she guesses they would put her in the trial, and she did not want to get in it because she didn't have any time; * * * that when she saw the pictures she was not so sure; that when Mr. Roche came and took her around and showed them to her then she was more certain; that it could not have been on any other day than Tuesday, May 13th, that she saw those boys; that when she took the paper and saw the pictures she thought they were the fellows, but she was not sure, and that was in the two weeks, she don't know when it was, it was the same day, in the two days." In connection with this testimony it may be noted that Mullen admitted having bought the chops from Timmerman, but he said that they were purchased on the 12th of May, instead of on the 13th.

Joseph J. O'Neill was on May 13th, 1924, conductor on a Baltimore & Ohio Railroad train arriving at Mt. Royal Station from Wilmington at 12.50. That train was composed of eight cars, of which two were ordinary day coaches and one a "combined," that is, it was used partly for baggage and partly as a smoking car, and it was a train that race track followers used to go to the races on. The witness was called twice for the State. When first called he said that he had collected on May 13th seven tickets from Wilmington, but was not asked to identify anyone. Later he was recalled and identified Dobbs, Mullen and Foran as three of a party of four men who boarded the train at Wilmington. He further said that before he testified on the first occasion he had been shown photographs by the State's attorney and asked if he could identify them as pictures of the men who rode on his train on May 13th, but he said he could not from the pictures. He said that his attention was attracted to them because they were "loose looking" characters.

Harry F. Stein, an employee of the Pennsylvania Railroad Company, testified that on May 13th, 1924, one train

was scheduled to leave Union Station, Baltimore, for Philadelphia at 4 o'clock P. M. and one at 4.12. That the four o'clock train was scheduled to arrive at West Philadelphia at 6.04 and at North Philadelphia at 6.17 standard time, and that the 4.12 train was scheduled to arrive at Broad Street Station at 6.55 standard time.

Mrs. Evelyn Wayne testified that between seven-thirty and eight o'clock, daylight saving time, on the evening of May 13th, Gross, Mullen, and Dobbs rented a room from her at 702 Pine Street, Philadelphia.

Joseph J. Weller, superintendent of transportation of the Baltimore *News,* testified that he was crossing the Fallsway at Fayette Street at about 3.20 o'clock P. M., Tuesday, May 13th, when he saw a "baby grand" Chevrolet automobile painted green, containing four boys, driven north along the Fallsway at about thirty-five miles an hour.

In addition to this, the State called a number of witnesses to prove various details and incidents tending to corroborate the confession of Mullen, as well as to show the circumstances under which that confession and the admission of the other traversers were obtained.

The defense was an alibi. It was contended by the defendants that they were in Wilmington, Delaware, on the 13th of May; that on that morning they were tried and fined in a police court there for trespassing on railroad property; that after that they took the 1.30 boat on the Wilson Line for Philadelphia; that they rented a room from Mrs. Wayne, at about 5.30 or 5.45 daylight saving time, and remained in Philadelphia that night, and until the following Thursday. In support of that contention they called a number of witnesses, who gave testimony tending to support it.

In their natural order the first exceptions to be considered are those which relate to rulings of the trial court made in connection with the opening statement of the State's attorney of Baltimore City. In opening the State's case, over the objection of the defendants, he was permitted to state to

the trial court, sitting as a jury, first that one or the other of the several defendants had committed a series of crimes in no way connected with the crime charged in the indictment, and, second, that they had planned to commit a number of other crimes, all of which he described in detail. In considering that statement, it must be remembered that the Vulgaris and Denhardt mentioned in it have no connection with the crime charged in the indictment in this case.

The State's attorney, in the course of his statement, informed the court that Dobbs, Gross, and two other men, Denhardt and Vulgaris, stole an automobile to drive to Philadelphia, and wrecked it on the way; that they went on to Philadelphia, and while there they met Foran; that those four and Foran planned to return to Baltimore and rob a store on North Avenue, a building association, a relief fund at a drug store, "hold up" a magazine collector, and "knock off" a Mr. Shehan. That later Vulgaris and Denhardt were arrested, and after their arrest Mullen joined Dobbs, Gross, and Foran and was with them when they were arrested in Wilmington on May 12th on the charge of trespassing on railroad property; that subsequent to April 8th Dobbs and Denhardt burglarized a school and a store to get clothes; that Dobbs, Denhardt and Gross stole a number of automobiles and drove them about the City of Baltimore; and that they burglarized the Littman store on Marsh Market Space to get guns; that they were arrested apparently for trespass with Denhardt while at a house to which they had been invited by Denhardt, who had permission to go there, and that they escaped from the police; that Dobbs, Denhardt, Gross, Foran, and Vulgaris stole automobiles nightly after their return to Baltimore from Philadelphia and used them to drive about the city and to sleep in, and that the same five men robbed a drug store at Hamilton, a suburb of Baltimore City.

The action of the court in allowing these statements to be made is the basis of the first three exceptions.

In dealing with these exceptions there are two things to

be considered,—one, whether the rulings involved in them were erroneous, and the other, whether the error, if there was error, was injurious or reversible error.

Concerning the first proposition there cannot in my opinion, be any reasonable doubt. These general rules appear to be almost universally recognized, first, that the character of a defendant in a criminal case is not an issue until he puts it in issue; second, that evidence of unconnected and unrelated crimes which do not show knowledge, motive, intent, a common scheme, or identification, is inadmissible against a defendant in a criminal case as tending to show that he committed the crime whereof he stands indicted in such case. *McClelland v. State,* 138 Md. 536; *Underhill, Cr. Ev.*, (2nd ed.), par. 78; 16 *C. J.,* 586, 580; note 1, 581; *Wharton, Cr. Ev.* (10th ed.), par. 487; *ibid.,* pars. 30, 31; *Hochheimer, Cr. L.,* par. 175; 8 *R. C. L.,* p. 198; *ibid.,* p. 212. Third, that where the character of a defendant in a criminal case is in issue it may not be attacked by proof of specific bad acts, each forming a constituent offence, *Wharton, Cr. Ev.,* par. 618; *R. C. L.,* par. 205; *Underhill, Cr. Ev.,* par. 82; 16 *C. J.* 582; and, fourth, that the prosecuting attorney for the State may not, in opening the case for the State, state facts which are clearly irrelevant or incompetent; attack the defendant's character or reputation before it has been put in issue, charge him with the commission of other crimes except where the commission of such crimes would be admissible to show motive, intent, and the like as an exception to the general rule, or state any other thing or matter which would likely improperly and unfairly prejudice the court or jury against the defendant. 16 *C. J.,* 890; *Wharton, Cr. Proc.* (10th ed.), par. 1496. Applying these principles to the facts before us, in my opinion the trial court erred in the rulings involved in these exceptions. The State's attorney was permitted, over the repeated objections of the defendants, to violate every one of these rules, for not only did he in that statement attack the characters of the several defendants before they were

put in issue, but he charged them with having committed
unrelated crimes in no way connected with the crime charged
in the indictment, and he narrated to the court the circum-
stances and details of such unrelated crimes.

The second proposition is one of more difficulty, and the
difficulty arises from the fact that the defendants were
tried before the court, composed of three judges, instead of
before a jury. The defendants had a constitutional right
to be tried before a fair and impartial jury, and they had a
statutory right to waive that mode of trial and elect to be
tried before the court. C. P. G. L., art. 27, sec. 91. In
such case the court is "substituted for a jury and has the
same duties and functions to perform in passing upon the
guilt or innocence of the accused" (*League v. State,* 36 Md.
258) ; and should be controlled by the same consideration
of law and facts as would a jury under similar circum-
stances, *Alexander v. Capital Paint Co.,* 136 Md. 666. The
judges who constituted the trial court in this case there-
fore exercised dual and independent functions,—first, they
sat as a court of criminal jurisdiction to pass upon such
matters of law as arose in the trial of the case, and then
they sat as a jury to determine the issues of fact tendered
by the pleadings in accordance with the weight and value
of the evidence before them, and rulings made by them on
questions of law as a court are reviewable notwithstanding
that they sat also as a jury, for in electing to have their
case tried before the court the defendants waived none of
the rights assured to them by the Constitution, statutes, and
the laws of the State, to be tried upon legal evidence and
according to the law of the land.

To determine whether a court sitting as a jury in a crim-
inal case was affected to the prejudice of the prisoner by
errors committed by it in its function as a court is a delicate
and difficult question, concerning which there seems to be
no definite rule or much authority. On the one hand, it is
proposed that it is unlikely that three judges of high char-
acter, wholly impartial, influenced only by a desire to do

justice, learned in the law, and trained in the administration of its processes, would be influenced or affected by incompetent evidence or irrelevant or improper statements. While on the other hand it is said that, granting all that to be true, that nevertheless the judges acting as jurors are as other men, and to some extent at least incapable of divesting themselves of those natural sentiments, prejudices and dispositions which affect the judgment of the usual and average man, or at least that it would be unsafe to conclusively presume that they are capable of doing so. Because it is reasonable to assume that they would not allow such statements to be made or such evidence to be introduced unless they believed them proper and material to aid them in determining the case, since to assume anything else it is necessary to believe a manifest absurdity, which is that they admitted such statements or evidence knowing them to be improper, arbitrarily without any reason, and without intending to be bound by them.

There is undoubtedly force in both of these positions, but in my opinion the better rule and one more in keeping with common sense and experience lies between the two. It would be unreasonable to assume that every trivial or inconsequential error committed in the trial of a case would have a controlling and decisive influence on the mind of a learned and able judge trained and experienced in the administration of justice, and, on the other hand, it would be dangerous to assume that a judge, no matter how able or experienced, who in his capacity of judge erred in his rulings on vital and important legal principles bearing a substantial relation to the issues in the case, could not in his capacity as a juror be influenced by the error, for that position would reduce the defendant's right to be tried according to law to a mockery, since it would assume that the judge as a juror could not possibly be influenced by his errors as a judge, and that such errors were necessarily harmless.

In my opinion, therefore, when the errors are of such a character, and so interwoven with the case, as to lead a fair

and impartial mind, trained and experienced in judicial
investigation, upon an examination of the whole case and all
the rulings involved therein, to the conclusion that there is
a reasonable probability that such errors may have affected
the determination of the case, they are prejudicial and re-
versible.

It may be noted in connection with the question immedi-
ately before us, that the objectionable statements were made
with the sanction and approval of the court, over the re-
peated objections of the defendants, that they cover many
pages of the printed record, and that they constituted a
wholly improper but nevertheless damning indictment of
the characters of the several defendants. They are there-
fore quite different from the statements with which the
court was dealing in such cases as *Esterline v. State,* 105 Md.
629, where the court instructed the jury to disregard the
objectionable statement, and the *Toomer* case, 112 Md. 285,
where the remark did not refer to the defendant.

Nor do I think that that rule as stated is at all inconsist-
ent with the *Cothron* case, 138 Md. 101. What was said
by the court in that case must be read in connection with
the facts with which the court was dealing, and so regarded
it is not inconsistent with the rule I have stated.

It is difficult to measure even with approximate accuracy
the effect of such a statement by an attorney justly enjoying
the confidence of the court, occupying a position of grave
responsibility and dignity, upon the judicial mind. The hu-
man mind is so constituted that no matter what its training
or capacity may be it is difficult to divest it entirely and
always of extraneous and confusing impressions. And char-
acter is so vital and important a factor in the investigation
of crime, that it is always easier to believe that a vicious
and dangerous criminal committed a crime of the character
under investigation here, than to believe that one whose
character was unimpeached had committed it, and yet the
law requires that the quality and quantity of evidence re-
quired to convict shall be the same in either case, because

unless he himself puts it in issue, the character of the ac-
cused in such a case as this cannot be attacked or im-
peached, except in so far as the relevant and material evi-
dence has that effect.

In dealing with the exceptions relating to the admission
of evidence of unrelated crimes it may be assumed as a gen-
eral rule that one crime cannot be proved by proof of an-
other (16 *C. J.*, p. 586; *Underhill, Cr. Ev.*, par. 87; *Whar-
ton, Cr. Ev.*, par. 30; *Avery v. State*, 121 Md. 229; *Meno v.
State*, 117 Md. 435), except for the purpose stated in my
reference to the first three exceptions. That rule is so firmly
established and so generally recognized that any extended
discussion of the plain and obvious reasons upon which it
rests seems uncalled for if not unwarranted.

Applying it to the facts of this case, I find that it was
repeatedly violated in the rulings involved in the exceptions
now under discussion. The defendants were indicted for a
murder, and while they were required to meet that charge,
they were not required without warning or notice to be
prepared to defend themselves against charges relating to
alleged offenses wholly independent of and in no wise con-
nected with that crime, for even if they were gangsters,
thieves, or homeless vagabonds, that did not tend to prove
that they committed the specific crime for which they were
indicted, and the evidence in the case should have been con-
fined to the only issue before the court, which was whether
they had in fact committed that crime. That it took a
wider range will be apparent from a brief reference to the
testimony included in these bills of exception.

Edward Denhardt, under arrest on other charges, and
who for a time occupied the same cell with Mullen, called
as a witness for the State, was permitted over objection to
testify that he and Dobbs had on April 8th escaped from
St. Mary's Industrial School; that he, Gross, Dobbs, and
Vulgaris went in a "machine" to Philadelphia on April
21st, where they met Foran, who came back to Baltimore
in a "machine" with them six days later; that after they

came back to Baltimore they constantly rode about in "machines" and that they kept that up until he was "caught." The admission of this testimony is the subject of exceptions sixteen to thirty-six. While much of it was wholly irrelevant and immaterial, its admission could not be considered as having prejudiced the defendants, but for the fact that it followed so closely objectionable parts of the opening statements of the State's attorney and was apparently designed to support it. He said in that statement that the witness, Dobbs, Gross, and Vulgaris rode to Philadelphia in a stolen automobile, that they and Foran returned to Baltimore in a stolen "machine" and that they nightly stole other "machines" and drove about Baltimore. In the course of the testimony to which I have referred the State again and again asked questions which could have had no purpose other than to show that they were riding in stolen machines. The court refused to permit some of these questions, but allowed the witness to say that they drove to Philadelphia in a "machine," that they returned in a "machine," and that after their return they remained together riding about in "machines." It was of course permissible and proper to show that the defendants knew each other, how long they had known each other, where and when they met, &c., but this testimony went much further than that. Its natural effect and only apparent purpose was to show that for a time two of the defendants, and for a time three of the defendants, were members of a gang of automobile thieves, operating in Baltimore and Philadelphia, and it was offered generally as against all of the defendants, although one of them had no connection with it at all. The test of the relevancy of evidence in a criminal case is whether it tends to prove the issue, and the test of this evidence was whether the fact that Gross, Vulgaris, Denhardt, Foran, and Dobbs up to the 29th of April were members of a gang of automobile thieves, if that was a fact, or the fact that Dobbs escaped from a penal institution, if that was a fact, proves that Dobbs, Gross, Foran, and Mullen murdered Mr. Cohen

on the 13th of May. Measured by that test, the evidence
relating to the exceptions numbered sixteen to twenty-three,
inclusive, twenty-nine and thirty and thirty-six, was irrele-
vant and in my opinion improperly admitted.

Exceptions numbered forty to fifty-nine, inclusive, relate
to rulings of the court allowing the witness, Denhardt, to
describe in the most minute detail the robbery of the Litt-
man store on Marsh Market Space in the City of Baltimore
by Dobbs, Gross, Foran, and the witness, and exception
eighty-three involves the same question. That testimony
was offered upon two theories, one indicated by a remark of
the deputy State's attorney, that the similarity of the two
crimes indicated that they were committed by the same per-
sons. The other that the testimony was admissible to show
that the persons who murdered Cohen procured pistols at
the Littman store. But obviously neither of these theories
is tenable. There is nothing in the facts found in the record
to take this case out of the general rule that "on a prosecu-
tion for a particular crime, evidence which in any manner
shows or tends to show that accused has committed another
crime wholly independent of that for which he is on trial,
even though it is a crime of the same sort, is irrelevant and
inadmissible." 16 *C. J.,* 586, n. 1; 8 *R. C. L.,* p. 198;
*Meno v. State,* 117 Md. 435. Nor was there any evidence
which could justify the inference that the two offences were
part of a single plan or scheme, or that the one supplied a
motive or had any connection whatever with the other.
Nor was it admissible for the purpose of showing that the
pistols obtained were used at the Cohen murder, because
there is no evidence in the case which shows that the pistols
used in the commission of that crime were obtained from
the Littman store, other than the alleged confession of Mul-
len, which could not have affected the other defendants, and
indeed the only evidence in the case is that they were not.
The testimony is that Cohen was shot with a .38 calibre
pistol, while the pistols found on the defendants were of a
different calibre, and the witness Peterson positively stated

that the pistol with which the crime was committed was different in appearance from those found in the possession of the defendants. This testimony therefore should have been excluded. It is contended by the State that, conceding there was error in these rulings, the defendants Dobbs, Foran, and Gross were not injured by them, because after evidence of the Littman robbery had been given they admitted their guilt, but I cannot agree with that. The question before the court was not whether they had robbed Littman's store, but whether the fact that they had robbed it proved that they murdered Mr. Cohen and since, under the established rules of law, it was inadmissible for that purpose, its only apparent purpose was to prejudice the court by showing that the defendants were violent and dangerous criminals of a type likely to commit such a crime, and the fact that after the State had been allowed to prove the Littman robbery, they on the advice of their counsel admitted their guilt, certainly could not have lessened the prejudice. The harm was done by placing the defendants in a position in which it became necessary for them to refer to and explain their connection with wholly irrelevant and immaterial charges which, while proving their character, which had been improperly put in issue by the State, had no connection with the crime for which they were being tried.

The one hundred and eleventh and one hundred and twelfth exceptions relate to questions asked in the cross-examination of Claude Dobbs, one of the defendants. Having testified that he was seventeen years old, and that between the ages of ten and fifteen he had been in the Juvenile Court fifteen times, and that he had been sent to St. Mary's Industrial School, and had been sent to jail for sixty days by Justice Staylor of the Traffic Court, he was asked: "When was it you held up that fellow in Druid Hill Park?" An objection to that question was overruled, and the court was informed by counsel for the traverser that he had been acquitted of that charge. He was then asked: "Now didn't you tell Lieutenant Feehley and Mr. Roche and myself down

at the Southern that you did that job ?" An objection to this question was also overruled. Both of these questions were obviously improper. The first assumed as a matter of fact that the witness had committed a crime of which he had been acquitted, and the second insinuated that he had admitted his guilt at some time before or after the trial at which he had been acquitted. The obvious purpose of these questions was to convey the information that Dobbs had been charged with crime, and to give the impression that although acquitted he was guilty. For the reasons so clearly stated by Judge Adkins, speaking for this Court in *McAllister v. State,* 140 Md. 651, there was error in these rulings.

The remaining group of exceptions relate to the alleged confessions of the several defendants, the most important of which are the statements attributed to Mullen.

According to the uncontradicted medical testimony in the case, Mullen is a physical and mental degenerate with the mentality of a child between the ages of nine and eleven, and Dr. John R. Oliver, chief medical officer of the Supreme Bench of Baltimore, who had first examined him in 1919, and again before the trial in this case, gave this description of him: "We find that the patient has a mental age equivalent to that of a child of not more than ten years. This applies more especially to the realm of the intelligence. He has, however, in the emotional sphere and in other spheres of the mind, a certain amount of practical natural ability that might enable him to do simple routine work of an ordinary type. He certainly knows the difference between right and wrong. He does not, however, seem always to realize the nature and consequence of his acts; he becomes very easily fatigued, and then his mind seems to work even less logically and less quickly than usual. He is indeed a rather low-grade type mentally."

He was arrested with Gross and Dobbs at Fredericksburg on May 22nd and taken to the Stafford jail. He escaped, was rearrested the same day, and lodged in the jail at Fredericksburg, and kept there until Saturday, May 24th, when

he was brought to Baltimore, taken first to the office of the
police commissioner and then to the Northeastern Police
Station. While he was in the jail at Fredericksburg, he was
interviewed and questioned by Chief Silas D. Perry and
Sergeant J. C. Chichester of the Fredericksburg police, and
on Friday night, May 24th, he was questioned by State's
Attorney O'Conor, Lieutenant Manning, and Detectives
King and Busky, from 11.30 P. M. until 2.30 A. M. From
the time of his arrival in Baltimore until he signed the
alleged confession on May 29th, he was day after day ques-
tioned and examined by or in the presence of one or more
of the following persons: State's Attorney O'Conor, Deputy
State's Attorneys Wells and Edgett, Lieutenant Manning,
Captain Burns, and Captain Mooney, Detectives King, Kah-
ler, Roche, Feehley, and on one occasion by Police Commis-
sioner Gaither. The first statement made by him which
was reduced to writing was taken on Saturday, May 24th,
in the police commissioner's office, and in that statement he
denied all knowledge of the crime, and insisted that he
was with Gross, Dobbs, and Foran when they were locked
up in Wilmington on May 13th. Later on in the same state-
ment, although it was undoubtedly true that he was in
Wilmington on that occasion, he gave the following answers
to questions asked by Mr. O'Conor: "Were you over in
Philadelphia with them? A. No, sir. Q. Were you up in
Wilmington with them and got locked up? A. No, sir. Q.
That story you just told was told to protect them, wasn't
it? You just thought it would help them out, isn't that it?
A. Certainly, I told to help them out."

During that period between May 22nd and May 29th he
was without counsel, and in his own testimony he said with-
out contradiction that he was not allowed to communicate
with friend or relative. Several police officials, present
when the statements were made, said that they were not
induced by any threats or promises, but at the time the con-
fession was offered in evidence only three of the fifteen or
more persons who were present or took part in examining

him during his imprisonment at Fredericksburg or Balti-
more had testified. According to his notes the final state-
ment of Mullen was taken in shorthand by Mr. Ely, a court
stenographer, on Thursday evening, May 29th, 1924. On
Wednesday evening, May 28th, Mullen testified that this
occurred: "A. Well, they brought a paper over there, and
down in one corner had Dobbs' picture in it, and he said,
'Dobbs confessed.' Q. Who said that? A. Mr. O'Conor.
Q. Well, how did he say that? A. They just brought a
paper in there and they said, 'Here is a paper here, Dobbs
confessed,' and just showed me the headlines. Q. Was it
Mr. O'Conor that said that or one of the detectives or Cap-
tain Burns? A. Mr. O'Conor said it. He said, 'Why don't
you come clean now, and tell us everything you know? We
know you are in this murder, and I told them anything I
could tell them, any lies—they would not believe me at first."
The evidence found in the statements themselves relating
to inducements is very unsatisfactory, for instead of stating
to the prisoner that he was not obliged to make a statement,
that whatever he said might be used against him, the State's
attorney at the conclusion of the whole confession made this
statement: "Now, Charles, I did make plain to you from
the very outset that of course we had no promises to make
to you and we have made no threats nor offers to you in
order to induce you to make this statement, and you have
made it, have you not, of your own free will? A. Yes, sir."
And in General Gaither's office, near the beginning of the
first statement, he said: "Now, as I told you last night, we
offered you nothing, made no threats aganist you and made
no promises to you—just said if you wished to tell the truth,
which you said you would do and which you say you did do,
we would listen to you, at the same time not compelling you
to say anything, and you didn't have to say anything. When
did you meet those boys? A. Friday night, half past seven."

The statement of May 24th is in question and answer
form, the question being asked by Mr. O'Conor, the State's
attorney, and it bears little intrinsic evidence that it was

voluntary, but rather resembles the cross-examination of a
hostile witness. The questions were often peremptory in
form, and always insistent, and its character and the atti-
tude of Mullen is illustrated by these quotations from it:
"Joe, you talked very frankly down South about it. You
said you didn't have anything to do with it. You had noth-
ing to do with the case, did you? A. No, sir. Q. Do you
know a boy named Denhardt,—you don't know Denhardt,
do you? A. No. Q. Well, where were you when they told
you that Foran was the boy that drove the car? A. I ain't
got no more to say. Q. That is all right about that, but
was it before you left Baltimore or afterwards? Now, you
told me that, you were very frank and open about it, and I
have treated you all right, haven't I, and Mr. King and these
other men have treated you all right? (Witness nodding
head.) Q. I told you we were going to be fair with you,
and when you told me that I didn't face them with it, be-
cause you said you didn't want that? Where were you
when they said Foran drove the car? A. I haven't got any
more to say, Mr. O'Conor. Q. I asked you about them com-
ing back from Philadelphia, about some place on North
Avenue. How about what you told me about the building
association, huh? A. I got no more to say. Q. Well, now,
do you want to shut up. A. I'll shut up. Q. Why did you
tell me last night you were up to Wilmington with them
and got locked up. A. I did go to Wilmington. I'll tell you
the truth. I did go." * * * "You told me something last
night about another case. You know about the 'Mash' Mar-
ket Place, don't you? How about those guns taken out of
the car last night; were they your guns? A. One of them
was mine. Q. And which was the other one? A. I believe
it belongs to Dobbs or Gross. I don't know. Q. Which
was yours? A. The pearl-handled one. Q. And where had
you gotten it. A. I had it. Q. Whose was the other gun?
A. I don't know which one it belonged to. Q. Where did
they say they had gotten it? Now, you know. Tell the
truth about it. You've got nothing to fear if you tell the

truth and if you weren't in it. Where did they say they got the other gun? A. Denhardt told you where they got the guns."

In passing upon the admissibility of Mullen's confession made under these circumsatnces, I cannot lose sight of the fact that according to the undisputed facts of the case it was made by a person with the mentality of a child between nine and eleven years of age, after he had been subjected day and night to constant questioning for five or six days, during which time he was prevented from communicating with any friend or relative, after he had been induced by an artifice to believe erroneously that another person had confessed the crime with which he was charged, and after he had been told by the State's attorney that they were going to be "fair" with him, and that if he told the truth and was not "in it" he had nothing to fear, and that at that very time he had committed other crimes for which he could have been prosecuted by the State's attorney, and that his statement that he was present at the crime is not only not corroborated but is contradicted by the testimony of every witness present when it was committed who testified in the case.

The law in American courts relating to the admissibility of the confessions of persons accused of crime is neither uniform, definite, or certain. In some jurisdictions it is fixed by statutes, and in others the courts differ in their interpretation of the common law. But notwithstanding that, certain principles may be regarded as established and fixed as a part of the common law, some by the definite weight of authority and others by all courts. The first is that before a confession can be offered in evidence it must be shown to be the free and voluntary act of the person making it, and that the burden of showing that is upon the State. The reasons for that rule are very clearly and convincingly told in *Wharton's Criminal Evidence,* paragraph 622e, and the ultimate test in all cases is, "Was the situation such that there was a reasonable probability that the accused would make a

false confession?" *Ibid.* All other rules relating to that subject are subsidiary and subordinate to that. The first and most important duty of the court therefore is to ascertain whether the confession was free and voluntary, and that preliminary issue is a question for the court. *McCleary v. State,* 122 Md. 394. One of the most important considerations affecting such an inquiry is the method by which the confession was obtained, for if it was obtained by means of a threat, intimidation, promise, or other inducement, that fact casts a doubt upon its voluntary character, because experience has taught that even innocent persons charged with crime may under the influence of hope or fear confess falsely in the belief that that is the readiest escape from immediate danger or probable injury. *Ibid.*

The rule had its inception in the general dissatisfaction with the practice, legalized for many centuries, of officials for the state, of extorting confessions from prisoners by various methods of torture, and it is permanently expressed in the constitutional provision that no man shall be compelled to testify against himself. With advancing civilization the shocking brutalities of the torture chamber have largely disappeared, and are certainly illegal everywhere. But there still remains the natural desire on the part of arresting officers to secure from persons in their custody charged with crime some admission or acknowledgment of guilt which will facilitate their conviction, and which is bluntly and we think accurately characterized by an expression used by Captain Burns, one of the witnesses in this case, "that it was his business to get them," that "he is paid to get all criminals." But while this is a natural and not improper desire on the part of such an official conscientiously interested in the protection of the public safety, it has led to grave abuses, and the power and authority which the police have over persons in their custody may, without any conscious intent, unless it is wisely exercised and controlled, be used to compel such persons not only to testfiy against themselves, but even to testify falsely. For that reason it is

the duty of the courts to scrutinize with the most exacting and discriminating care confessions obtained from persons under arrest, and not to admit or consider them at all until they have been satisfied that there is no reasonable probability that they are not free and voluntary. *Wharton, Cr. Ev.,* 622j; *Watts v. State,* 99 Md. 30.

A subordinate rule is that a confession is not voluntary which is obtained by threats, intimidation, a promise or inducement. As to that general principle there is little dissent, but there is some conflict as to what constitutes a threat, a promise, or inducement. It has been held in different American courts that the fact that the confession was obtained by questioning, even where the questions were rough and assumed the prisoner's guilt, or through an appeal to conscience or religion, or through artifice, falsehood or deception, or through advice or exhortation, does not exclude the hypothesis that it is voluntary. 16 *C. J.,* 720 *et seq.,* 729. Nor does the fact that the defendant was intoxicated when he made it, under the influence of drugs, mentally incompetent, or a child of tender years. *Ibid.,* 729. While the courts of this State have not gone so far, it has been held that mental irresponsibility does not in itself make a confession inadmissible (*McCleary v. State, supra*), although it may be considered in determining whether it was voluntary (*Biscoe v. State,* 67 Md. 6), and that the fact that the prisoner was handcuffed or bound, and deprived of the benefit of counsel through the misconduct of the State's attorney, when he made the confession (*McCleary v. State, supra*), or that it was made by a grown man with the mind of a child of ten years, and that before he made it the police said to him, "Why didn't he tell the truth?" "Why don't you tell it right, you are lying all through; the truth will hurt no one," did not affect the admissibility of the confession.

Concerning the effect of an exhortation to tell the truth accompanied by an expression that it would be better to tell the truth, the authorities are divided, but the rule in this State, following the reasoning of the English courts, is

that such an expression renders the confession inadmissible. *Biscoe v. State,* 67 Md. 6.

Applying these principles to the facts of this case, in my opinion this confession should not have been admitted in evidence, for two reasons, first, because the State did not meet the burden which it assumed of the showing that it was voluntary, and, second, because the testimony negatives that conclusion.    The defendant from the time of his arrest until the confession was examined at different times, by or in the presence of fifteen men, singly or in groups.  Of these three were examined, before the confession was offered, and Mr. O'Conor, who alone could have offered any immunity to the defendant, although it appears from his own questions that he had had conversations with him other than those which were reduced to writing, was never called at all. Nor did several of the police officers who took part in the examination of Mullen testify at all as to any threats or inducements made to him.

Nor can I escape the conclusion that when the State's attorney said to the prisoner, when he had been arrested for and accused of the murder, "Tell the truth about it.   You've got nothing to fear if you tell the truth, and you weren't in it," he brought this case within the rule stated in the *Biscoe* case, *supra.*   It is true he qualified the expression "You've got nothing to fear if you tell the truth" by adding "if you weren't in it."   But what did that mean to the ignorant mental defective to whom he was speaking.   While the particular question may have related to the Littman robbery, he was being questioned about the murder.   What did he understand was meant by being "in it"?   He may well have thought that it meant that if he had taken no actual physical part in the robbery or murder, and told what the State's attorney would accept as the "truth," that he would "have nothing to fear."   He may not have known of the rule that all persons participating in a felony are equally guilty of a homicide committed in its perpetration.   Certainly, in the absence of any statement from the State's

attorney as to what had been said to the prisoner prior to that remark, it cannot be said that it may not naturally have led the prisoner to believe that if he "confessed," and had not actually robbed the store or shot its owner, he had nothing to fear, even if he had been present when the crime was committed. That he did so understand it may certainly be inferred from this testimony of Captain Mooney: "(On June 3) I went up into the detention room on the second floor of the Northeastern Police Station, and as I opened the door Mullen had a paper in his hand. I think it was the Baltimore *American*. On the front sheet was a picture of he and I; and he flourished this paper in his hand and he said, 'Look at this; look at this.' I said, 'Charlie, that's nothing to become excited about. That is only a picture of you and I.' And he said, 'I know,' and then he read the heading, and it was 'Mullen pleads guilty of murder,' and it went on with some other little remarks, and he said, 'Captain, you know I didn't plead guilty to killing anybody; I plead guilty to being with them, but I didn't do the killing.' I said, 'Well, Charlie, now control yourself; that is all right, just keep quiet.'" That remark was made at the interview in General Gaither's office on March 24th, and while therefore it would not necessarily have the effect of rendering Mullen's confessions on May 29th and to Denhardt inadmissible, it was incumbent on the State to show before they were admitted that the influence exerted by it had been removed. 16 *C. J.,* 722. And since no evidence to that effect is found in the record, those confessions should on the testimony before us have been excluded.

These appear to me reversible errors. That the evidence to which they refer was inadmissible seems clear upon the authorities referred to.

The doctrine that a court must be presumed in criminal cases to be immune from the influence of improper evidence admitted by it seems to me dangerous, radical and unsound.

It is constantly being held that courts err in their judgment both of law and of fact in civil cases; in law courts

where they occupy the dual function of court and jury, and in equity courts where they pass both upon the law and the facts, and I see no reason why a degree of infallibility, which is not given to their conclusions in those cases, should be given to them in criminal cases. It is difficult to believe that any person, layman or lawyer, could voluntarily and deliberately listen to a recital of a long series of crimes against an individual charged with crime, and still be able to weigh the evidence against him with the same impartial and unbiased judgment he would possess if he had not known that the traverser habitually violated the law. Certainly I cannot assume that any court would permit such statements as those made by the State's attorney or admit such evidence as was referred to in these exceptions for any reason except a belief in the fact that they were proper and admissible, and certainly, if they believed that, they may have been and certainly should have been influenced by them.

There have been, it is true, some somewhat rhetorical statements attributed to judges in criminal cases, such as that society is at war with the criminal (cited in support of the position that departures from legal rules do not injure persons convicted of crime), but it must be remembreed that until an accused is convicted he is entitled in defending himself against any specific charge to the presumption that he is innocent of that charge until he is proved guilty beyond a reasonable doubt, and that he is entitled under any and all circumstances to a fair and an impartial trial.

The record discloses that the able, careful, and conscientious judges who tried this case were fully conscious of the serious responsibility which rested on them, and that they gave it the most earnest care and consideration, but believing as I do that there were errors in the rulings to which I have referred, I could not in justice to them assume that their conclusion was not affected by those errors, because their rulings were necessarily made in the belief that the

evidence referred to in them, and the statements of the
State's attorney, were relevant and proper. . It is, of course,
possible that their conclusion was not affected by any con-
sideration of that evidence, but in a criminal case no court
is at liberty to indulge in speculation on such a subject. ·

I am authorized to say that Judges Adkins and Digges
concur in this opinion, and that Judge Walsh concurs in it
except as to that part of it in which I have treated the rul-
ings of the court in reference to the opening statement of
the State's attorney as reversible error. He considers those
rulings erroneous, but does not consider the error reversible.
Judge Urner concurs only in so much of the opinion as
deals with the exceptions relating to the admission of evi-
dence as to the Littman robbery.

URNER, J., filed the following separate opinion:

I agree to a reversal and the award of a new trial in this
case because of the admission of evidence proving a crime
unrelated to the one charged in the indictment. All of the
other rulings at the trial were, in my judgment, free of
reversible error. But for the reasons stated, upon that point,
in the opinion written by Judge Offutt, I concur in the view
that the objection to the proof of the crime committed at
the Littman store should have been sustained. I have had
some difficulty upon the question as to whether, in view
of all the competent testimony in the case, the admission
of the evidence as to that crime was of sufficient consequence
to require a reversal. If the case had been tried before a
jury, instead of being submitted to experienced judges, I
could have no hesitation in concluding that the irrelevant
proof of the independent crime was prejudicial to the de-
fense. It may have had such an effect upon the minds of
the judges by whom the defendants were convicted. Any
doubt which I may have on that subject should be resolved
in favor of the accused. This duty is emphasized by the
fact that if, while regarding the ruling as an error, I should
adopt the view that it was not prejudicial, the judgment

imposing .death penalties would be affirmed by an equally divided Court.

The opening statement of the State's attorney, which is one of the principal subjects of exception, was addressed to judges who were trying the case without a jury, and who subsequently refused, except in regard to the separate offense already mentioned, to admit proof of the various crimes described in the statement as having been committed by the defendants prior to the homicide for which they were on trial. Under the circumstances, I think the refusal of the court to interrupt the State's attorney's recital of facts which he desired to prove is not a sufficient ground for disturbing the judgment.

In my opinion the confession of Mullen was properly admitted. The careful and able judges who tried the case had the benefit of a close and prolonged observation of Mullen during the trial, particularly when he was on the witness stand, and their final ruling on the admissibility of the confession was not made until after they heard him testify. I have not found in his testimony any such indication of mental immaturity as to induce me to differ from the conclusion as to his competency formed by the judges before whom he appeared and testified in person. They had opportunities not available to us for determining how much weight should be given to the opinions of the defense's witnesses as to the degree of Mullen's mental development. But if we accept as conclusive the testimony that he had the mentality of a boy ten or eleven years old, I see no reason to hold that the trial judges were wrong in admitting the confession. A boy of that age is not legally incompetent as a witness, and Mullen's actual competency evidently was apparent to the judges who heard his testimony. The objections urged against the confession tend to affect its weight rather than its admissibility. In view of the sworn assurances of the responsible officials in charge that no improper influence was used to obtain the confession, I do not think that the opposite theory should be adopted as a ground of reversal.

Except in regard to the ruling which is the sole ground of the reversal, I concur in the opinion filed by Chief Judge Bond.

Bond, C. J., filed the following dissenting opinion, in which Pattison and Parke, JJ., concurred:

It seems to me that the statement of facts contained in the opinion prepared by Judge Offutt, giving as it does only one view of the facts, fails to present the full problem before the trial judges in this case, and may possibly leave the conflicting views of the judges of this Court difficult to understand. No full statement of the testimony will be undertaken in this opinion, but I should like to add a few general explanatory observations. The murder inquired into was one of a form which has become quite familiar now. According to all the eyewitnesses, young men came up suddenly by automobile in front of the victim's small jewelry store, broke his store window and took out some of his stock of jewelry, and then, when he made a show of interfering, murdered him, and quickly drove away. The suddenness of it all appears to have produced the effect which was to have been expected; the people nearby grasped only fragmentary facts. There were some, however, who gave the police positive identifications, picking out pictures of the appellants, or some of them, and afterwards identifying them in person. There were conflicts among the witnesses on details; that is common, and to be expected. Grounds for attacking the testimony of one witness and another were presented, and were availed of; that, too, is common, and to be expected. Confirmatory facts, or elements of strength, were also argued, but they will not be rehearsed here, because it is no part of our function to argue the facts, or to review the findings of the court on them. The case was one containing conflicts in the testimony of witnesses, in short. But there is no outstanding fact or condition which makes the resulting problem different in its essentials from that presented in many other cases. Able counsel were assigned

to the prisoners, and they have given them their best efforts. The judges below, men as well trained in weighing evidence and avoiding erroneous convictions as the people of the State can hope to furnish for the work, heard what the witnesses had to say, and heard the arguments of counsel; and after it all they were convinced that the appellants were the young men who committed the robbery and murder. It appears, too, that on motions for a new trial, the judges of the Supreme Bench of Baltimore City as a whole heard the evidence reviewed and considered its weight, and came to the conclusion that there was nothing to justify a retrial. Whether these conclusions on the facts were correct, we are not to inquire. Suffice it to say on this, that these prisoners have had as thorough an investigation of the facts and as thorough a hearing of the considerations in their favor as can ever be given them with humanity constructed as it is. If the question of their guilt or innocence is to be tried a second time, it should be only because some departure from rules materially prejudiced them in their trial on the relevant facts,—not merely that there may have been some variation from the letter of a rule, for if any slip from rule in the course of a long trial were held to vitiate the whole trial, then we should be demanding by our rules more than humanity could regularly give. There must be something materially prejudicing the prisoners in trial on the relevant facts. I shall take up a little space on the two groups of rulings principally objected to; first, on the objections made during the opening statement by the State's attorney.

Starting from the fact that the State's attorney in his opening statement before the court described previous offenses of the prisoners which were irrelevant and not admissible in evidence, and for the most part were not admitted, the chief question raised by the objections at that stage would seem to have been whether the opening statement should have been interrupted from time to time for consideration of the admissibility of the evidence alluded to. The

overruling of the objections was expressly based upon the ground that this should not be done. And unless the trial court is confronted with a clear abuse of the opportunities afforded by the review of evidence in the opening statement, good practice requires that it should not be done. The alternative of pausing to test the admissibility of each element of fact would be an intolerable obstruction to the presentation of a case, and would frequently be useless because of the impossibility of foreseeing the whole groundwork of the case as it would be when witnesses would be questioned on these facts. There was no jury in the case, untrained in the hearing of facts on the issues, and the judges who tried the facts were thoroughly trained in these matters, and it seems hardly too much to assume that they actually relied upon only such of the facts laid before them as tended legitimately to prove the issues. Furthermore the evidence shows that these defendants had made their previous careers more or less familiar to the judges who presided in the criminal courts of Baltimore from time to time. Upon these considerations, my conclusion has been that there was nothing in these rulings of the judges during the opening statement that demands that another trial should be had. And without extending the argument on this part of the case, substantially the same considerations seem to me to lead to the conclusion that the admission in evidence of facts concerning the similar robbery and theft of pistols from the Littman place does not justify ordering the case to be tried a second time, even though the pistol with which the murder was committed proved to have been of a different calibre, a fact which might be considered, indeed, as rendering the testimony on this point favorable for the accused.

It seems to me the outstanding facts to be weighed in considering the admissibility of Mullen's confession are that in itself it is, in respect to any features with which the court is concerned, indistinguishable from the statement of any other capable, spontaneous witness; that almost up to the time of trial he intended to plead guilty; that when counsel

was assigned for him, and talked to him in the judges' chambers, he said that the facts given in his confession were true; and that the only objection he made to the confession on the trial was that he made it under fear of a beating raised in his mind by a remark which he said was made by the chief of detectives in the office of the police commissioner several days previously, that the police authorities would make him tell the truth. According to the testimony in this record, the witness was questioned on each of four or five days. The questioning was persistent, but not constant; it covered parts of each day only. That the questioning, which finally persuades a prisoner to confess, is persistently carried on, is no ground for rejecting the confession, unless, indeed, there is pressure of some sort which appears likely to have produced a confession as the price of relief; and there is no suggestion of such pressure in this record. See authorities collected in 50 *L. R. A.*, N. S., 1077, and note, page 1085.

The prisoner was told falsely that another prisoner had confessed his part in the murder. This was a trick, but a legitimate one. It would tend to produce, not a false confession, but a true one. "The object of evidence," said Chief Justice Mitchell, in *Commonwealth v. Cressinger,* 193 Pa. St. 326, 327, "is to get at the truth, and a trick which has no tendency to produce a confession except one in accordance with the truth is always admissible. Society and the criminal are at war, and a capture by surprise, or ambush, or masked battery is as permissible in the one case as in the other." 50 *L. R. A.,* N. S., 1088; *Ann Cas.,* 1916 D, 962; 12 *A. L. R.,* 798.

Again there is expert testimony classifying Mullen's mentality as that of a boy of ten or eleven, in some respects, and an expression of opinion by several alienists that he is more than ordinarily susceptible to suggestion. But in this connection we have also the fact that at the time the confession was offered Mullen's counsel was not prepared to present evidence against admitting it, and it was received to be ruled

on subsequently; and then Mullen himself was produced as a witness on his own behalf and fully exhibited himself before the judges prior to the ruling.

There is no testimony that any attempt was made to extort a confession embodying mere suggestions by others. And if there had been, the judges below had at least some justification for concluding that the suggestion failed to materialize in this confession.

Mullen's statements of a threat to make him tell the truth are contradicted by General Gaither, the police commissioner, and others who were present at the interview designated, and of course we cannot say they should not have been believed by the triers of the facts. The remark of the State's attorney that the prisoner, Mullen, had nothing to fear if he had nothing to do with the crime, seems clearly enough to have referred to the Littman robbery only. The prisoner as a witness was being questioned about that occurrence only, and I see no likelihood of the prisoner's having taken the assurance to have any reference to the murder which he was being tried for, and concerned in his confession.