567 A.2d 476

**Dwayne HARRIS aka Eric Harris**

v.

**STATE of Maryland.**

**No. 641, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Dec. 28, 1989.

Certiorari Granted March 13, 1990.

248

250

Bradford C. Peabody, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Kreg Paul Greer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MOYLAN, BISHOP and GARRITY, JJ.

MOYLAN, Judge.

The Maryland decisional law on the subject that some call "other crimes evidence" reflects the general state of the law elsewhere and gives no occasion for complaint. The language and the framework of analysis used by both appellate courts of this state to describe and to explain that law, however, leave much to be desired in terms of current usage. Our decisions are better than our opinions. Ironically, the leading opinion on the subject, *Ross v. State*, 276 Md. 664, 350 A.2d 680 (1976), is also the leading culprit. In addressing the primary issue raised on this appeal, we will attempt to bring our vocabulary and our organizational context more into line with prevailing linguistic and analytic conventions.

### The Present Case

The appellant, Dwayne Harris, a/k/a Eric Harris, was convicted by a Baltimore City jury, presided over by Judge Roger W. Brown, of possession of cocaine with intent to distribute and of carrying a handgun. Upon this appeal, he raises the following two contentions:

1. That his prior convictions for possession of heroin with intent to distribute should not have been admitted to prove his intent to distribute cocaine in the instant case; and

2. That the motion to suppress physical evidence seized in the course of a warrantless search was erroneously denied.

The appellant was one of three persons in an automobile stopped by the police on the night of November 21, 1987. A police search of the appellant revealed both a handgun and a plastic bag containing a significant quantity of cocaine. Although the appellant did not take the stand, his counsel virtually conceded, in opening statement and closing argument, the simple possession of cocaine and directed the attention of the jury to the sufficiency of the State's evidence to support the *mens rea* of intent to distribute.

Over objection, the State introduced two prior convictions of the appellant, one on April 1, 1985 and the other on July 22, 1985, for possession of heroin with intent to distribute. The trial judge instructed the jury with respect to the evidentiary significance of those prior convictions:

> "You have heard evidence in this case that the Defendant was on a prior occasion convicted of a crime of possession of heroin with intent to distribute which is not a charge in this case. You may consider that evidence in connection with all of the other evidence in this case, *but only as it relates to the question of intent."* (Emphasis supplied).

The appellant argues that evidence of "other crimes" to prove intent is forbidden by *Ross v. State, supra.* The State counters that proof of intent is a well recognized exception to the rule forbidding evidence of other crimes. In a sense, they are both right. In a sense, they are both using antiquated and awkward tools of analysis.

### Federal Rule of Evidence 404

Although Maryland, of course, has not adopted the Federal Rules of Evidence, the Federal Rule on the subject now before us accurately summarizes our law. Its statement of that law, however, is both in more general and in more neutral terms than is our own. Federal Rule 404(a) states a rule of exclusion when character evidence is offered to prove action in conformity with that character. It also recognizes three exceptions to that exclusionary rule. These are genuine exceptions whereunder the use of a character trait is permitted to prove conduct in conformity with that trait, rather than what Maryland uncritically calls "exceptions" which are rather instances not even covered by the terms of the exclusionary rule. FRE 404(a) states:

> "(a) Character evidence generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) Character of the accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

(2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(3) Character of witness. Evidence of the character of a witness, as provided in rules 607, 608, and 609."

FRE 404(b) goes on to state specifically one particular instance of the larger exclusionary phenomenon, that of where evidence of "other crimes, wrongs, or acts" is offered to prove that a person (generally the defendant) acted in conformity with such demonstrated bad character. In a separate sentence, the Rule then makes explicit what is otherwise implicit in any event: that the exclusionary provision does not even purport to cover situations where such evidence is offered for *a purpose other than proving conduct in conformity with such character:*

"(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible *to prove the character of a person in order to show that he acted in conformity therewith.* It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis supplied).

■ With respect to evidence of other crimes, wrongs, or acts, there are two separate and complementary situations. When such evidence is offered to prove a criminal propensity, it is, subject to the exceptions spelled out in FRE 404(a), inadmissible. When such evidence, on the other hand, is offered for any other relevant purpose, it is, subject to the usual weighing between relevance and its counterweights, admissible. Neither rule is an exception to the other and there is no hierarchial "pecking order" between them.

Ironically, the Maryland case law prior to 1976 was very much more in tune with this evidentiary philosophy than it has been since then. In *Lowery v. State*, 202 Md. 314, 96 A.2d 20 (1953), Chief Judge Sobeloff explained, in scrupulously neutral terms, that evidence of "other unrelated crimes or misconduct" is inadmissible for the purpose of attacking the character of the accused but is admissible to show motive or intent. It was inadmissible for one purpose and admissible for others. Neither statement was an exception to the other. The criterion for determining admissibility or inadmissibility was simply the purpose for which the evidence was offered:

> "As a general rule, it is reversible error for the prosecution to attack the character of the accused before it has been put in issue by him, or to show other unrelated crimes or misconduct likely to cause prejudice against him. *Dobbs v. State*, 148 Md. 34, 129 A. 275.
>
> But *the rule is equally established that where the testimony shows motive or intent it is entitled to be admitted.*" (Emphasis supplied).

202 Md. at 318, 96 A.2d 20.

Indeed, as early as 1925,[1] the Court of Appeals recognized that there was no general exclusionary rule for evi-

---

1. The earliest instances we have found where Maryland dealt with the admissibility of evidence of other unrelated crimes or bad acts were *Bloomer v. State*, 48 Md. 521, 534–535 (1878); *Kernan v. State*, 65 Md. 253, 258–259, 4 A. 124, 124–125 (1886); and *Lamb v. State*, 66 Md. 285, 287–288, 7 A. 399, 400–401 (1886). In all three cases, the evidence was offered not to show criminal propensity but to show relevant facts. In all three cases, it was admitted and not under any special dispensation as exceptions from the norm. In *Lamb v. State*, the Court of Appeals held that in a criminal prosecution for abortion, it was admissible to show that the accused had made a later attempt to accomplish the same end. "That he made a subsequent attempt to accomplish the same purpose by a different means, is admissible to show with what purpose and intent he made the attempt charged in the indictment." 66 Md. at 287, 7 A. at 400. The *Lamb* case as well as two subsequent cases (*Luery v. State*, 116 Md. 284, 288–289, 81 A. 681, 682 (1911), and *McClelland v. State*, 138 Md. 533, 536–537, 114 A. 584, 585–586 (1921)) relied heavily on the English decision of *Rex v. Ellis*, 6 B. & C. 145, wherein it was held:

dence of other crimes but only a limited one where such evidence was offered to show conduct in conformity with bad character. In *Dobbs v. State,* 148 Md. 34, 46, 129 A. 275, 280 (1925), Judge Offutt stated the law in a way that almost anticipated FRE 404:

> "These general rules appear to be almost universally recognized, first, that the character of a defendant in a criminal case is not an issue until he puts it in issue; second, that *evidence of* unconnected and *unrelated crimes which do not show knowledge, motive, intent, a common scheme, or identification, is inadmissible* against a defendant in a criminal case *as tending to show that he committed the crime* whereof he stands indicted in such case." (Emphasis supplied).

### *Ross v. State (1976)*

Although some earlier linguistic slippage can be spotted,[2] it was the 1976 decision of *Ross v. State, supra,* that grammatically so restructured the statement of this law as to change its emphasis if not its substance. The exaggerated credibility given *Ross* by the subsequent case law, moreover, treating it virtually as a new dispensation, has compounded the damage. Although a close and careful reading of *Ross* reveals that it did not change preexisting law, it nevertheless managed to put a semantic "spin" on the law that has handicapped subsequent attempts to get a firm grip on it.

Instead of a neutral statement that the evidence in issue is inadmissible to show propensity but is, with equally enthusiastic endorsement, admissible for any other relevant

---

"Generally speaking, it is not competent to a prosecutor to prove a man guilty of one felony, by proving him guilty of another unconnected felony; but where several felonies are connected together, and form part of one entire transaction, then the one is evidence to show the character of the other."

**2.** *See,* for instance, *Berger v. State,* 179 Md. 410, 414, 20 A.2d 146, 148 (1941); *Harrison v. State,* 276 Md. 122, 155, 345 A.2d 830, 848–849 (1975).

purpose, the restatement by *Ross* has had the practical effect of treating such evidence as presumptively inadmissible. The State, instead of facing the routine task of showing relevance and overcoming its counterweights, faces the more daunting challenge of demonstrating a special exemption from an exclusionary norm. What has been subliminally influenced is the mind-set or "tilt" with which we approach the question. From the very way in which the proposition is stated, we find ourselves subconsciously predisposed toward exclusion "going in."

### Even Inadmissible Evidence Is Not Irrelevant

Our first criticism of *Ross* is a minor one. If the opinion is to be taken as an oracle, however, critical examination is appropriate. *Ross* stated what purported to be the general rule, 276 Md. at 669, 350 A.2d 680:

> "The frequently enunciated general rule in this state, followed uniformly elsewhere, is that in a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, *is irrelevant and inadmissible.*" (Emphasis supplied).

Evidence of other crimes, at least when offered to show propensity, is, of course, generally *inadmissible*, as *Ross* correctly states. It is inadmissible, however, not because it is *irrelevant*, but for the very opposite reason that it is *too relevant*. Such evidence tends to make it more likely that a person with a criminal history committed the present crime than would be the case if no such history existed.[3] This is all that the relevancy requirement demands. That relevance (in other contexts, not to be condemned) is massively outweighed, however, by the undue

---

3. *McCormick* defines probative value or logical relevance: "It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence." C. McCormick, *Evidence* § 185, at 542 (E. Cleary 3d ed. 1984). *See also Troja v. Black & Decker Mfg. Co.*, 62 Md.App. 101, 114, 488 A.2d 516, 522 (1985).

significance that the fact finder might be tempted to give it. Dean Wigmore explained the policy behind the exclusion of such evidence:

> "It may almost be said that *it is because of the indubitable relevancy* of specific bad acts showing the character of the accused *that such evidence is excluded. It is objectionable not because it has no appreciable probative value but because it has too much.* The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge." (Emphasis supplied).

IA *Wigmore on Evidence* § 58.2, at 1212 (Tillers rev.1983). *See also Neam v. State,* 14 Md.App. 180, 186–190, 286 A.2d 540, 544–546 (1972). With respect to the relevance of such evidence, C. McCormick, *Evidence* § 190 (E. Cleary 3d ed. 1984), observed, at 557:

> "The evidence of bad character *would not be irrelevant,* but in the setting of the jury trial particularly the dangers of prejudice, confusion and time-consumption outweigh the probative value." (Footnotes omitted) (Emphasis supplied).

This was, indeed, the very section of *McCormick* cited as authority for *Ross*'s statement of the general rule. *Ross*'s observation about irrelevance was not only unsupported by its cited authority but was also unnecessary to its holding. Even conceding that evidence of other crimes has some relevance by no means concedes its admissibility. What is required, at one level or another, is the weighing process described by *McCormick* § 185, at 544:

> "[R]elevant evidence is evidence that in some degree advances the inquiry. It is material and probative. As such, it is admissible, at least prima facie. But this relevance does not ensure admissibility. There remains the question of whether its value is worth what it costs.

A great deal of evidence is excluded on the ground that the costs outweigh the benefits."

Professor McLain refers to the same weighing process:

"The trial court, in its discretion, may exclude relevant evidence if it believes that the probative value of the evidence is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, misleading or distraction of the trier of fact, or waste of time, such as by needless presentation of cumulative evidence.

Many specific rules of exclusion result from a weighing of probative value against these competing considerations." (Footnotes omitted).

L. McLain, *Maryland Evidence* § 403.1, at 297–298 (1987) [hereinafter cited as *McLain*]. *And see* Uviller, *Evidence of Character To Prove Conduct: Illusion, Illogic, and Injustice in the Courtroom*, 130 U.Pa.L.Rev. 845, 868 (1982):

"However much common sense and ordinary intelligence may insist that evidence of criminal propensity is relevant, powerful considerations of policy preclude the use of prior convictions on the issue of guilt."

▄▄ Indeed, the *Ross* opinion itself paradoxically seems to acknowledge that evidence of other crimes has at least *prima facie* relevance, as it finds it necessary to discuss the counterweights, 276 Md. at 669, 350 A.2d 680:

"[T]here are additional reasons underlying the general rule. Evidence of other crimes may tend to confuse the jurors or prejudice their minds against the accused and to predispose them to a belief in his guilt."

The very utilization of a weighing process necessarily implies the relevance of the evidence being weighed. Since irrelevant evidence is inadmissible *per se*,[4] there would be no occasion even to look at countervailing considerations with respect to it.

---

**4.** Both Fed.R.Evid. 402 and Unif.R.Evid. 402 (1974) provide, "Evidence which is not relevant is not admissible."

The undeniable "clincher" with respect to the relevance of good or bad character to prove conduct in conformity therewith is the universally recognized rule that a defendant may introduce evidence of his good character, at least with respect to a pertinent trait,[5] to show the unlikelihood that he would have committed the crime charged.[6] A person of peaceful character, for instance, would be less likely to have committed the violent assault;[7] a person of chaste character, less likely to have engaged in the alleged immorality; a person of honest character, less likely to have perpetrated the mendacious fraud.[8] Once the defendant has put his character in issue, moreover, the State is free to counter-attack by showing bad character with respect to the trait that has been thrown into the hazard.[9] Thus, a violent defendant would be more likely to have flailed out in murderous rage; an unchaste defendant, more likely to have trafficked in wanton carnality; a deceitful defendant, more likely to have engineered the meretricious scam. "It takes a certain type ∴.." When the only purpose of all of this is to show conduct in conformity with character, the defendant would hardly be permitted to consume valuable court time and to call witness after witness to show good character nor would the State be permitted to counter with proof of bad character, if such character evidence were, as

---

5. *See Braxton v. State,* 11 Md.App. 435, 274 A.2d 647 (1971).

6. *See* Comment, *Procedural Protections of the Criminal Defendant—A Reevaluation of the Privilege Against Self–Incrimination and the Rule Excluding Evidence of Propensity to Commit Crime,* 78 Harv.L.Rev. 426, 438 (1964) [hereinafter cited as *Harvard Comment* ]:
"That the defendant is allowed to introduce propensity evidence at all indicates that such evidence is considered relevant and that the primary reason for its exclusion is the likelihood of prejudice to the defendant."

7. *See Pierce v. State,* 62 Md.App. 453, 460–462, 490 A.2d 261, 265–266 (1985).

8. *See Grant v. State,* 55 Md.App. 1, 38–39, 461 A.2d 524, 542 (1983).

9. *See Poole v. State,* 295 Md. 167, 181, 453 A.2d 1218, 1226 (1983).

*Ross* states, irrelevant. Simply because the initial election is with the defendant does not make relevant the irrelevant.

On the isolated issue of relevancy, the Continental experience is illuminating. Although the Continental law and the common law, because of a different degree of solicitude for the criminal defendant, treat the admissibility of evidence of a defendant's character differently, the question of logical relevancy—the naked validity of the syllogism—hardly changes as we cross the English Channel:

> "In the Continental traditions of criminal trials, evidence of the character of the accused (including specific prior acts) is given great consideration and is freely used. The exclusion of evidence of the character of the accused is one of the peculiar features of the Anglo–American system that distinguishes it from Continental systems." (Footnotes omitted).

IA *Wigmore on Evidence* § 58.1, at 1212 (Tillers rev.1983). On deductive validity, our ultimate authority is neither *Ross* nor even the Supreme Court but Aristotle.

It is clear then that such evidence offered for such a purpose is, albeit inadmissible for other reasons, indisputably *relevant*. Notwithstanding that, the unthinking and at-times ritualistic incantation of *Ross* for thirteen years has caused the erroneous statement about irrelevancy to reappear so often and in so many places [10] that it is problematic

---

**10.** *See, e.g., McKnight v. State,* 280 Md. 604, 612, 375 A.2d 551, 556 (1977); *Vogel v. State,* 315 Md. 458, 464, 554 A.2d 1231, 1233–1234 (1989); *White v. State,* 33 Md.App. 626, 630, 365 A.2d 605, 607 (1976); *Nasim v. State,* 34 Md.App. 65, 75, 366 A.2d 70, 76–77 (1976); *Hoes v. State,* 35 Md.App. 61, 64, 368 A.2d 1080, 1082–1083 (1977); *Brafman v. State,* 38 Md.App. 465, 471, 381 A.2d 687, 690 (1978); *Martin v. State,* 40 Md.App. 248, 251, 389 A.2d 1374, 1376 (1978); *Worthen v. State,* 42 Md.App. 20, 38–39, 399 A.2d 272, 282 (1979); *Bratt v. State,* 62 Md.App. 535, 543, 490 A.2d 728, 732 (1985); *Savoy v. State,* 64 Md.App. 241, 251, 494 A.2d 957, 962 (1985); *Craddock v. State,* 64 Md.App. 269, 274, 494 A.2d 971, 973 (1985); *Moore v. State,* 73 Md.App. 36, 39–40, 533 A.2d 1, 2 (1987); *Govostis v. State,* 74 Md.App. 457, 463, 538 A.2d 338, 341 (1988); *Stancil v. State,* 78 Md.App. 376, 382, 553 A.2d 268, 271 (1989); *Timney v. State,* 80 Md.App. 356, 363, 563 A.2d 1121, 1125 (1989).

whether the error can still be excised before it hopelessly metastasizes. The effort, nonetheless, should be made.

The effort may not, indeed, be futile. A harbinger of better tidings has recently appeared in the excellent majority opinion of Judge Adkins in *State v. Faulkner*, 314 Md. 630, 552 A.2d 896 (1989). Instead of falling into the easy habit of quoting or rehashing the standard "boilerplate" of *Ross* and its progeny, it is a fresh and meticulously careful statement. Notwithstanding one minuscule verbal lapse [11] (even Homer nods), it is an unbiased presentation of what may be called the " 'Other Crimes' Rule," 314 Md. at 633–635, 552 A.2d 896, essentially unencumbered by the semantic baggage of *Ross*.

*Faulkner* does not remotely suggest that "other crimes" evidence is irrelevant even when offered to prove only a propensity to commit "the offense for which he is on trial." It is only because of its implicit relevancy that *Faulkner* turns to the counterweights as the rationale for its inadmissibility. "Evidence of other crimes may tend to confuse the jurors, predispose them to a belief in the defendant's guilt, or prejudice their minds against the defendant." 314 Md. at 633, 552 A.2d 896.

Other salutary features of *Faulkner*'s refreshing restatement will be discussed hereinafter. It is to be hoped that Judge Adkins' opinion is a watershed and will become the new doctrinal point of departure, even as *Ross* had been for the thirteen years that went before.

---

The mischiefs once released from Pandora's Box, moreover, have a tendency to expand. By *Brown v. State*, 57 Md.App. 128, 134, 469 A.2d 462, 465 (1984), for instance, *Ross*'s statement about such evidence being "irrelevant and inadmissible" had somehow evolved into the cause-and-effect relationship of such evidence being "irrelevant and, therefore, inadmissible."

11. After stating an inclusionary principle for relevant purposes other than proving propensity as an evidentiary rule separate from and of equal dignity with the exclusionary principle when the purpose is to show propensity, *Faulkner* does lapse into the unfortunate use of the word "exceptions" to refer to those legitimate purposes.

*The Propensity Rule: A Limited Rule of Exclusion*

The primary criticism of *Ross* is that it stated its exclusionary principle far too broadly. Instead of a carefully crafted rule prohibiting the proof of bad character to make the commission of the current crime more likely, it pronounced a sweeping ban (deferring for the moment the consideration of exceptions) on such evidence generally, regardless of purpose:

> "The frequently enunciated general rule in this state, followed uniformly elsewhere, is that in a prosecution for a particular crime, *evidence which in any manner shows* or tends to show *that the accused has committed another crime wholly independent of that for which he is on trial,* even though it be a crime of the same type, *is* irrelevant and *inadmissible."* (Emphasis supplied).

276 Md. at 669, 350 A.2d 680. In the immediate wake of *Ross, Cross v. State,* 282 Md. 468, 473, 386 A.2d 757, 761 (1978), spoke, if anything, in more absolute and certainly in more hyperbolic terms:

> "*[T]here are few principles of American criminal jurisprudence more universally accepted than* the rule that evidence which tends to show that the accused committed another crime independent of that for which he is on trial, even one of the same type, is inadmissible." (Emphasis supplied).

■ The exclusionary principle involved is far more narrow than *Ross* and *Cross* would indicate. Evidence of other crimes or wrongful acts—of bad character—is inadmissible when offered initially by the State only when it is offered for the purpose of showing the defendant's criminal propensity and, therefore, the greater likelihood that he committed the crime charged. This is the accepted and conventional statement of the exclusionary principle today not only according to FRE 404 but throughout the academic community. *McLain* § 404.1, at 342, describes the rule:

> "When character is not directly in issue, but character evidence is offered to show that a party is a 'good' or

'bad' person, either in general or with regard to a particular trait, and thus did the 'right' or 'wrong' thing in the incident which led to the trial, it is inadmissible. *This rule of general exclusion of character evidence when offered to prove that a person acted in accordance with his or her character on a particular occasion is known as the propensity rule."* (Footnote omitted) (Emphasis supplied).

The same Propensity Rule, by name, is recognized and discussed in *Harvard Comment,* at 435–436:

"In the common law system the prosecutor has traditionally been prohibited from introducing evidence of a defendant's character *solely to prove his propensity to commit the crime charged.* In a prosecution for theft, for example, the prosecutor may not introduce evidence of prior stealing or dishonest reputation, *despite the conceded relevance of such evidence* to the question of whether the defendant committed the crime of which he is accused. Today this rule, hereinafter referred to as the 'propensity rule,' is ... considered basic to the common law system.... *[T]he propensity rule is accepted by all jurisdictions* as a common law or statutory rule of evidence." (Footnotes omitted) (Emphasis supplied).

*And see* Comment, *Other Crimes Evidence at Trial: Of Balancing and Other Matters,* 70 Yale L.J. 763, 766 (1961) [hereinafter cited as *Yale Comment*]:

"All jurisdictions observe the requirement that no evidence may be admitted which tends solely to prove that the accused has a 'criminal disposition.' The rationale for this absolute prohibition is that such evidence is always more prejudicial than probative." (Footnotes omitted).

An immediate benefit of the Propensity Rule is that its very name serves to keep both its purpose and its limits at the front of the mind.

■ With respect to the Propensity Rule, all of the authorities agree that the relevance or probative value of the evidence is outweighed by the dangers of undue preju-

dice and of confusing or distracting the jury with a side issue. 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[04], "Overview of the Propensity Rule" (1982), explains the rationale, at 404–26:

"The rationale underlying this exclusionary rule, sometimes termed 'the propensity rule' has been expressed as follows:

The rule is justified primarily on the ground that *the probative value of propensity evidence is outweighed by its prejudicial effect* on a jury. The introduction of such evidence is said to create a danger that the jury will punish the defendant for offenses other than those charged, or at least that it will convict when unsure of guilt, because it is convinced that the defendant is a bad man deserving of punishment. In addition, it is argued that the jury might be unable to identify with a defendant of offensive character, and hence tend to disbelieve the evidence in his favor. At the least, it is said that such evidence would be given greater probative weight than it deserves, and so lead to convictions on insufficient evidence." (Emphasis supplied).

*McCormick* § 186, at 549, observes, "Evidence of the general character of a party or witness *almost always has some probative value*, but in many situations, the probative value is slight and the potential for prejudice large." (Footnotes omitted). (Emphasis supplied). *McLain* § 404.1 explains the reason behind the exclusion, at 343–344:

"The general rule of exclusion of character evidence as proof of a person's conduct, therefore, stems at least in part from a fear that the fact-finder will give undue weight to character evidence. We do not wish to offer the jury an opportunity to punish a party because of his past, rather than because of the merits of the facts directly relating to the case." (Footnote omitted).

Although the Propensity Rule grew out of the balancing process that *McCormick*, Title 7, at 540, calls "Relevancy and Its Counterweights," that weighing process is no longer committed to the trial judge on a case-by-case basis. The

weighing has already been done at a higher level and has produced a general rule of exclusion as a matter of law. As *McCormick* § 190 points out, at 565:

"When the sole purpose of the other crimes evidence is to show some propensity to commit the crime at trial, there is no room for ad hoc balancing. The evidence is then unequivocally inadmissible—this is [the] meaning of the rule against other crimes evidence." (Footnote omitted).

 The only true exceptions to the Propensity Rule are those cases where character evidence is admissible to show propensity for the further purpose of showing conduct in conformity with that propensity,[12] such as:

---

**12.** Two other apparent exceptions to the Propensity Rule are, on closer analysis, probably better conceptualized as instances of the rule inapplicable. The first is where a criminal defendant has asserted the defense of entrapment. In such a case, the State may offer, by way of rebuttal (or even earlier if a forewarning of the entrapment defense has appeared as in, *e.g.,* opening statement), the defendant's propensity or predisposition to commit the crime notwithstanding the fact that the police afforded him the opportunity and even encouraged him to do so. In that case, exclusion of the State's evidence is not called for by the Propensity Rule notwithstanding the fact that the evidence is being offered literally to prove propensity. The demonstrated propensity in that situation is not being offered to show conduct in conformity therewith but, by way of contrast, only to negate the defense that an otherwise law-abiding person was entrapped into behavior to which he was not predisposed.

The propensity in such a context is offered not to show the defendant's criminal agency, the thing forbidden by the Propensity Rule, but rather to negate an affirmative defense. As Judge Bell pointed out, in *Cason v. State,* 66 Md.App. 757, 775–776, 505 A.2d 919, 929 (1986), "It is settled that evidence of prior and subsequent offenses may be admissible to rebut the defense of entrapment. *Wethington v. State,* 3 Md.App. 237, 238 A.2d 581 (1968)." *And see* the thorough discussion by Judge Chasanow, in *Bowser v. State,* 50 Md.App. 363, 371–375, 439 A.2d 1, 5–8 (1981). In *Sorrells v. United States,* 287 U.S. 435, 451–452, 53 S.Ct. 210, 216, 77 L.Ed. 413, 422 (1932), the Supreme Court pointed out:

"The predisposition and criminal design of the defendant are relevant.... [I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue. If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense."

1) Where the defendant has placed a pertinent trait of his character in issue and where the State rebuts the same; [13]
2) Where the defendant has placed the character of the victim for violence in issue and the State rebuts the same; [14] and
3) Where a witness places his character for credibility in issue by taking the stand. [15]

 In the case at bar, evidence of the appellant's two prior convictions for possessing heroin with intent to distribute was not offered to prove the appellant's general propensity toward crime. Indeed, the appellant—in opening state-

---

Indeed, the defendant has almost invariably acknowledged his criminal agency in the act of asserting the entrapment defense. The purpose of the evidence is not, therefore, to show that the defendant "did it" but rather to determine whether the defendant, in "doing it," was "a strayed lamb or an ensnared wolf." Model Penal Code § 2.10, Comment (Tent. Draft No. 9, 1959). *And see McLain* § 404.13, at 368. In the special context of the entrapment defense, a predisposition toward or propensity for crime would appear to be what *Weinstein* calls a "consequential fact," the proof of which is beyond the ambit of the Propensity Rule:
"Character evidence offered to prove character when it is a consequential, material proposition, rather than to prove an act, does not fall within the prohibition of the rule and, consequently, is admissible." (Footnote omitted).
Paragraph 404[01], at 404–12.
The second situation that is also elusive in terms of its categorization is where proof of prior acts is permitted in the special case of sex crimes, particularly child molestation. In Maryland, such admissibility is restricted to proof of prior sexual acts with the same victim as that involved in the case on trial. *State v. Werner,* 302 Md. 550, 489 A.2d 1119 (1985); *Blake v. State,* 210 Md. 459, 463–464, 124 A.2d 273, 275 (1956); *Berger v. State,* 179 Md. 410, 414, 20 A.2d 146, 148 (1941). With such evidence thus restricted, it seems clear that its function in Maryland would be to prove such relevant facts as motive, intent, identity, and/or the absence of mistake or accident rather than to prove simply a general propensity.

**13.** *See McLain* § 404.2, at 346–350; *Braxton v. State,* 11 Md.App. 435, 274 A.2d 647 (1971).

**14.** *See McLain* § 404.3, at 350–351; *Thomas v. State,* 301 Md. 294, 306–307, 483 A.2d 6, 12–13 (1984).

**15.** *See McLain* § 404.4, at 351–352; *Barnes v. State,* 57 Md.App. 50, 57–60, 468 A.2d 1040, 1043–1044 (1984).

ment, in his motion for judgment of acquittal, and in closing argument—conceded the simple possession of cocaine. The only issue was whether the appellant had the *mens rea* of an intent to distribute. That was an element of the crime charged. Whatever the fate of such evidence may be as we turn in a moment to the question of relevancy and its counterweights, it clearly did not fall under the exclusionary sword of the Propensity Rule.

### *The So–Called "Exceptions" Are Not Exceptions*

As an inevitable consequence of stating the exclusionary principle overbroadly, an open-ended number of legitimate uses of evidence [16] are reduced to the presumptively suspect status of "exceptions" from an exclusionary norm. We have already discussed the unfortunate "tilt" or subconscious bias that this places upon uses of evidence that have no business being cast in such a shadow. In *Tichnell v. State*, 287 Md. 695, 711, 415 A.2d 830, 839 (1980), Chief Judge Murphy began to move away from this treatment of these legitimate purposes as "second class" evidentiary phenomena when he referred to some of them as "[s]ome of the well-established categories of evidence outside the ambit of the narrow rule of exclusion."

██ Whenever evidence of prior misconduct is offered for any purpose other than to show propensity, it is, subject only to the universal balancing of relevance and its counterweights, presumptively admissible. It should be so stated

---

**16.** As to the open-ended nature of this category, we noted in *Anaweck v. State*, 63 Md.App. 239, 257, 492 A.2d 658, 667 (1985):

"These five examples of relevance given by *Ross* and repeated by all of its progeny do not exhaust the category; it is an open-ended list always capable of expansion wherever a clear instance of relevance might arise that somehow fails to fit neatly into one of the pigeonholes.... The list of instances of relevance given in *Ross* simply serves as a helpful frame of reference for organizing quickly fully 95% of the instances when evidence of 'other crimes' will have substantial relevance. The decisive criterion nonetheless remains substantial relevance itself, not merely a convenient but coincidental identification with one of its familiar illustrative examples." (Citations omitted).

in affirmatively inclusionary terms. *McLain* § 404.5 does so, at 353:

> *"Evidence of prior conduct or misconduct may be received, however, in both civil and criminal cases if substantially relevant to some contested issue in the case other than to show conformity with that prior conduct.* Such evidence may be admissible for the limited purpose of proving, for example, motive, opportunity, intent, preparation, plan, common scheme, knowledge, identity, or absence of mistake or accident. The case law does not purport to have anticipated all purposes for which evidence may be offered other than propensity to act as one has in the past. *As long as the evidence is not offered for propensity, but for another issue material to the case, the court may admit it."* (Footnotes omitted) (Emphasis supplied).

It is similarly expressed in *Harvard Comment*, at 439: "Evidence of the defendant's prior misconduct is admissible in the prosecutor's case-in-chief if it is relevant for some other purpose than merely to show that the defendant is the sort of person who would be likely to commit the crime with which he is charged." (Footnote omitted).

Indeed, *State v. Faulkner* asserts an inclusionary principle in affirmative terms so long as the evidence is offered for some purpose other than to show guilt based upon propensity:

> "Evidence of other crimes may be admitted, however, if it is substantially relevant to some contested issue in the case and if it is not offered to prove the defendant's guilt based on propensity to commit crime or his character as a criminal."

314 Md. at 634, 552 A.2d 896. In the earlier case of *Waddell v. State*, 65 Md.App. 606, 610, 501 A.2d 865, 867 (1985), Judge Karwacki for this Court largely avoided the linguistic snares of *Ross* and stated an affirmative rule of admissibility when the purpose is other than to show propensity:

"[I]t is also true that evidence of other crimes is admissible when the evidence is substantially relevant for some other purpose than to show that the accused committed the crime on trial because of his criminal character."

In choosing the most felicitous way in which to express the rule or rules, there is more involved than a Thomistic exercise in counting the angels on the head of a pin.[17] The answer we get to a given problem is frequently a function of the way in which we ask the question. Whether we ultimately merge them together or not, we are really talking about two separate rules:

1. The Propensity Rule: When evidence of other crimes is offered to prove criminal propensity, it is, subject to several limited exceptions, inadmissible.

2. When evidence of other crimes is offered to prove a material fact other than propensity, the evidence is, subject to the balancing of relevance and its counterweights, admissible.

There is a simple symmetry to this that eliminates the skewed perspective that attends the *Ross* formulation.

It is grammatically possible, of course, as much of the case law has tried to do, to construct an omnibus rule with respect to "other crimes and bad acts" evidence generally. Even in such a case, however, the rule can take either of two diametrically opposed forms. It may be, as in *Ross* and its progeny, an exclusionary rule with a long and theoretically open-ended list of exceptions. The exceptions are so numerous that they "at times appear to swallow the rule," *Cross v. State, supra*, 282 Md. at 473, 386 A.2d 757, and what is in actuality a rule of general admissibility masquerades as a rule of exclusion. *See Yale Comment*, at 767:

---

17. As the *Yale Comment* observed, at 767:
"The 'exclusionary' and 'inclusionary' systems aim at the same goal—keeping from the jury disposition or character evidence—but the difference in approach may have significant effects at trial."

"Some courts using the language of 'exclusion' admit of so many acceptable uses of other crimes evidence that, in practical fact, the standard applied is as liberal as that articulated by 'inclusionary' courts." (Footnote omitted). Another flaw, looking at the extant efforts to state an exclusionary rule with a long list of exceptions, is the failure of such a formulation to express the only policy reason that rationally explains the difference between what is excluded and what is admitted—the distinction between the purpose of showing propensity and the purpose of showing every material fact other than propensity. There is, moreover, no necessity for a constantly growing list of so-called "exceptions" when there is a readily available common denominator formulation that embraces them all.

The opposite way to construct an omnibus rule is as an inclusionary rule with a single exception when the evidence is offered to show propensity. An inclusionary rule with a single exception is far more efficient than an exclusionary rule with an infinite number of exceptions. English courts have taken just such an inclusionary stance that unless the evidence demonstrates *only propensity and nothing more,* it is admissible. *See Regina v. Lawson,* 4 W.W.R. 350 (1971); *McLain* § 404.5, at 354 n. 5. *And see United States v. Diggs,* 649 F.2d 731, 737 (9th Cir.1981). The American trend is in this direction. As noted in *Yale Comment,* at 767:

"The federal courts and a small but growing number of states do not impose this exclusionary requirement; these jurisdictions have adopted an 'inclusionary' rule under which they admit all other crimes evidence relevant to an issue in the trial, except that which tends to prove only criminal disposition." (Footnote omitted).

*See also Harvard Comment,* at 439 n. 82:

"There are two somewhat different rules. The 'inclusionary' rule includes all relevant evidence save that tending only to prove propensity. The 'exclusionary' rule is more artificial and rigid in application, excluding all evidence except that which fits within certain traditional catego-

ries, such as motive or intent. The latter is now followed in the majority of jurisdictions, although the trend is toward the 'inclusionary' rule."

*And see Model Code of Evidence* Rule 306 (1942).

In two landmark articles in the Harvard Law Review in 1933 and 1938, Professor Julius Stone definitively analyzed the development of the law dealing with evidence of other crimes and bad acts, both in England and America, and traced the development of the linguistic confusion that has bedeviled that law. Stone, *The Rule of Exclusion of Similar Fact Evidence: England,* 46 Harv.L.Rev. 954 (1933) [hereinafter cited as *Stone I*]; Stone, *The Rule of Exclusion of Similar Fact Evidence: America,* 51 Harv.L.Rev. 988 (1938) [hereinafter cited as *Stone II*].

The 1810 decision of *Rex v. Cole,*[18] recognized as the starting point for the common law upon this subject, established a narrow exclusionary principle for the single case where evidence is offered to show only propensity:

"*Rex v. Cole* in 1810 established the principle that evidence which merely showed that the defendant had a propensity to do the sort of acts with which he was charged, was not admissible. This is a very narrow principle of exclusion, and not many cases during this period fall within it. On the other hand, the cases where evidence of similar facts was not excluded are numerous." (Footnote omitted).

*Stone I,* at 960–961. In the English case law through the mid–19th century, there was no confusion as to the narrow limits of that exclusionary rule:

"[T]here never did exist any rule of evidence in England excluding proof of other offences of the accused where such proof was relevant to a fact in issue. All that there was to be found was a very narrow rule excluding proof where the relevance was merely to the evil disposition of

---

**18.** The only citation for Rex v. Cole was its mention in Phillips, *Law of Evidence* 69, 70 (1st ed. 1814), which "brief passage ... constitutes the entire report."

the accused. Consequently the admission of similar facts where relevant to guilty knowledge in forgery and receiving cases was not, nor was it regarded at the time, as in any sense a derogation from the rule of exclusion. Such evidence was admitted not under exceptions to the rule, but as wholly outside its scope."

*Stone II*, at 990–991. This was precisely the law that the early American cases followed:

"There can be little doubt, therefore, that the early American courts thought that they were applying the English rule. What that English rule in reality was has been established in an earlier study. It did not exclude all similar bad acts, but only acts relevant merely through disposition."

*Stone II*, at 993.

In the latter half of the 19th century, neither English nor American courts ever set out to change that law by way of overt policy choice. They both, however, fell into careless drafting habits. Precedents were invoked mechanically without conscious thought as to the deeper principles undergirding them:

"Here the court is in a very interesting way doing what later became a staple habit of both English and American judges, namely, losing sight of the ultimate principle behind the original rule." (Footnote omitted).

*Stone II*, at 1002. Through the slack handling of precedent, courts began to treat what had earlier been no more than illustrations of relevant purposes as a fixed list of authoritative precedents. Under what Professor Stone called "a process of fossilization," *Stone II*, at 1021, a new use of evidence would be tested not against the proper criterion of relevance but by a matching test against each of the authorized purposes already locked into the law. If it did not match one of them, it did not pass muster under the specious notion that there was thus no precedent for admissibility. An open-ended test of relevance inadvertently hardened into a set list of past uses. That rigidified list, in its turn, came to be viewed as the settled sum total of

"exceptions" to an exclusionary principle that itself had never consciously been promulgated and had simply and uncritically been assumed to exist.

Out of this basic failure of understanding, came the split between what Professor Stone called "the original rule" and "the spurious rule":

> "The conflict was between the original rule which only excluded similar fact evidence when relevant merely to disposition, and a much broader spurious rule excluding all similar facts except those falling within a few closed categories settled by earlier decisions. Two rules so different were bound to cause and did cause inconsistencies."

*Stone II*, at 989. The original rule was clear:

> "[O]nly evidence relevant merely to propensity was excluded. Hence admissibility depended upon the answer to one simple question. Is this evidence in any way relevant to a fact in issue otherwise than by merely showing propensity?"

*Stone II*, at 1004. The spurious rule turned the original rule inside out:

> "The writer will call this form 'the spurious rule'.... In the place of the inquiry—is this evidence relevant otherwise than merely through propensity? there is immediately substituted the inquiry—does this evidence fall within any exception to the rule of exclusion?"

*Stone II*, at 1005.

An unfortunate but natural by-product of the spurious rule was this fossilization or ossification of what the rule insisted upon calling "exceptions":

> "In many exclusionary jurisdictions, the list of permissible uses for other crimes evidence has become crystallized through codification or stare decisis, and some courts have rigidly adhered to a particular list of categories." (Footnotes omitted).

*Yale Comment*, at 767. The unintended casualty was evidentiary relevance itself.

"To the extent that permissible uses are not expanded when new evidentiary relationships are encountered, the list of permissible uses becomes an inaccurate index of relevancy. It is more likely to be a *somewhat arbitrary collection of historically accepted rules.*" (Footnotes omitted). (Emphasis supplied).

*Yale Comment,* at 768. The handling of the so-called "exceptions" by *Ross* and its progeny is a textbook example of what Professor Stone referred to as this "somewhat arbitrary collection of historically accepted rules." *Ross* states, 276 Md. at 669–670, 350 A.2d 680:

"There are exceptions to this general exclusionary rule which, perhaps, are equally well-recognized. Thus, evidence of other crimes may be admitted when it tends to establish (1) motive, (2) intent, (3) absence of mistake, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) the identity of the person charged with the commission of a crime on trial.... Additional exceptions have also been recognized: When the several offenses are so connected in point of time or circumstances that one cannot be fully shown without proving the other, and to show a passion or propensity for illicit sexual relations with the particular person concerned in the crime on trial, *Berger v. State,* 179 Md. 410, 414, 20 A.2d 146 (1941); and to prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. C. McCormick, Evidence § 190, *supra.*" (Citations omitted).

Professor Stone condemned this fossilization as one of the inevitable and unfortunate consequences of the spurious rule:

"First in importance should be placed the inevitable tendency of the common law to categorize the application of a broad principle into minor rules, which, invented as illustrations and as an aid to memory, end unless checked by displacing the principle altogether. So the exceptions first appear as illustrations of relevance, to aid future

application. Then they are regarded as exhaustive, and when they are so regarded it follows that all evidence of other offences not within them is inadmissible, and the spurious rule is then complete."

*Stone II*, at 1035.

The process by which this deterioration took place was not deliberate. It was simply an unintended result of flaccid and imprecise thinking. Courts frequently wandered back and forth between contradictory positions without even realizing that they were doing so:

"The spurious rule grew up imperceptibly after 1840. It did not displace the original rule; they were applied side by side by the courts of the various states, often at different times in different cases in the courts of the same state, sometimes indeed at the same time in the same case by different judges of the same court, and finally, even on occasion by the same judge in the same opinion." (Footnote omitted).

*Stone II*, at 1034. Regretably, this seems to have been Maryland's fate.

To their credit, the English spotted the linguistic and doctrinal drift in *Makin v. Attorney–General for New South Wales* [1894] A.C. 57 and brought the slide to an abrupt halt. From that day to this, the English rule is free from doubt:

"The rule of exclusion as it exists in the English decisions today may be stated as follows:

Evidence which is relevant merely as showing that a person has a propensity to do acts of a certain kind is not admissible to prove that he did any such acts."

*Stone I*, at 976. All other proffered uses of such evidence are subjected only to the general test of relevancy and its counterweights. The American case law, fragmented into half a hundred jurisdictions, has unfortunately not responded with the same intellectual rigor:

"[W]hereas in England the original rule emerged from the crisis completely rehabilitated, and has since that time enjoyed almost undisturbed freedom from the disorder of

its spurious parasite, in America the result was less decisive." (Footnote omitted).

*Stone II*, at 1023. Professor Stone concluded by sounding a challenge:

"[A]s to those courts, and there are many, whose decisions have wavered with the incertitude of incomprehension between the original and spurious rules, applying at one time one, at another another, or to one crime one, and to one crime another, we would say—choose your feathers! Let the choice be made in full knowledge of the difference between the two rules, of the uncertain parentage of the spurious one, and the increased difficulties of application which it causes."

*Stone II*, at 1037. Let our response to that challenge be clear. Without changing Maryland's actual decisional law in any way (it is neither our prerogative nor our desire to do so), our opinions explaining our decisions will be framed in inclusionary rather than exclusionary terms. This is the unmistakable dictate of the more advanced and better thought on the subject. Congress, in amending the Advisory Committee's draft of FRE 404(b), deliberately changed the language in order to stress the inclusionary character of the rule. The report of the House Committee on the Judiciary explained:

"The second sentence of Rule 404(b) as submitted to Congress began with the words 'This subdivision does not exclude the evidence when offered'. The Committee amended this language to read 'It may, however, be admissible', the words used in the 1971 Advisory Committee draft, on the ground that this formulation properly placed greater emphasis on admissibility than did the final Court version."

H.R.Rep. No. 650, 93d Cong., 1st Sess. 7 (1973). *United States v. Long*, 574 F.2d 761, 766 (3d Cir.1978), commented upon the significance of the change: "The draftsmen of Rule 404(b) intended it to be construed as one of 'inclusion,' and not 'exclusion.' They intended to emphasize admissibility of 'other crime' evidence. This emerges from the legis-

lative history which saw the 'exclusionary' approach of the Supreme Court version of Rule 404(b) modified." *See McLain* § 404.15, at 381.

 Inherent in this approach is the rejection of any notion that there is a finite list of neatly compartmentalized "exceptions." What have been called "exceptions" are but illustrations of some of the more familiar relevant purposes other than the showing of propensity. Indeed, the conceptualization of legitimate evidentiary uses as fitting into a small group of mutually exclusive compartments serves only to confuse rather than to facilitate understanding. Proof of motive, for instance, is almost invariably proof of intent as well. Proof of motive, moreover, is one way of proving identity. Proof of intent, in turn, is *ipso facto* proof of knowledge and is also disproof of accident or mistake. *See, e.g., Nelson v. State*, 5 Md.App. 109, 121–122, 245 A.2d 606, 613 (1968); *Anaweck v. State*, 63 Md.App. 239, 257–259, 492 A.2d 658, 667–669 (1985). Proof of intent may also prove a plan or design and vice versa.[19] The very idea of a lengthy, albeit neat and tidy, laundry list of purposes is an absurdity when the only pertinent question needs to be whether the evidence is relevant to prove guilt in some way other than by showing propensity.[20]

The Comment, *Evidence of Other Crimes as Substantive Proof of Guilt in Maryland*, 9 U.Balt.L.Rev. 245, 267–268 (1980), enthusiastically endorses such an approach:

---

19. *See McLain* § 404.9, at 364:
 "Sometimes the courts confuse proof of 'common scheme' with proof of 'identity.'"
 *See also McLain* § 404.12, at 368, "[The] use of the evidence as proof of absence of mistake is merely the obverse of proof of intent." (Footnote omitted).

20. The flawed thinking that may result from the laundry-list approach was commented upon by C. McCormick, *Evidence* § 157 (1st ed. 1954), at 332:
 "[P]roblems of lessening the dangers of prejudice without too much sacrifice of relevant evidence can seldom if ever be satisfactorily solved by mechanical rules.... The policy may evaporate through the interstices of the classification."

"Current British Commonwealth cases, using essentially the same inclusionary rule as formulated by Stone, have set forth the criterion that unless the evidence of other crimes demonstrates propensity and nothing else, it is admissible. Such a rule represents a better alternative to the confusion the exclusionary rule has spawned because it directly focuses on the policy the courts seek to implement. It seeks the avoidance of convictions bottomed solely on propensity. Furthermore, those few American jurisdictions using an inclusionary rule at one time or another experienced no apparent difficulty applying that rule. At the very least this approach would eradicate the cumbersome exclusionary rule and its eight ill-defined exceptions." (Footnotes omitted).

This was also the approach taken by the Fourth Circuit in *United States v. Woods*, 484 F.2d 127 (4th Cir.1973). The defendant, charged with the death by suffocation of her infant foster son, objected to evidence demonstrating that beginning in 1945, the defendant had had custody of or access to nine children who suffered at least twenty cyanotic (deprived of oxygen) episodes resulting in seven deaths.[21] The evidence did not fit squarely into any of the so-called "exceptions" to the exclusionary rule. Judge Winter abandoned the effort to pigeonhole the relevant purpose and stated that the better cases hold that relevant evidence, subject to the usual balancing, is admissible as long as it is not offered for the sole purpose of showing criminal propensity. He reasoned, at 134:

"[E]vidence of other offenses may be received, if relevant, for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime, provided that the trial judge may exclude the

---

**21.** In terms of macabre relevance, *United States v. Woods* is rivaled only by the English decision of Rex v. George Joseph Smith, [1914–15], All E.R. Rcp. 262. At Smith's trial for the murder of his fourth wife by drowning in her bath tub, the evidence was deemed both generally relevant and admissible that his first three wives had also died by drowning in their bath tubs.

evidence if its probative value is outweighed by the risk that its admission will create a substantial danger of undue prejudice to the accused." (Footnote omitted).

### Relevance: Materiality Plus Probity

If, as here, the purpose for which the "other crimes" evidence is offered does not fall under the exclusionary prohibition of the Propensity Rule, as typified by FRE 404, what other evidentiary rules then govern its admissibility? Once again, both the Maryland law and the general law are accurately reflected in FRE 402 and FRE 403. FRE 402 (as well as Unif.R.Evid. 402 (1974)) provides, in pertinent part:

"All relevant evidence is admissible, except as otherwise provided.... Evidence which is not relevant is not admissible." [22]

 State v. Faulkner wisely directs that the very first question "a trial court is faced with" is to determine whether "evidence that relates to an offense separate from that for which the defendant is presently on trial" is relevant within the contemplation of our "other crimes" law. 314 Md. at 634, 552 A.2d 896. On the isolated issue of relevance (deferring for the moment the follow-up issue of ultimate admissibility), that is a question for the judge as a matter of law. No discretion is involved. If the evidence is irrelevant, it is thereby inadmissible as a matter of law. If the evidence is relevant, on the other hand, then the judge's discretion comes into play as to whether it shall be admitted. State v. Faulkner emphasized this distinction when it said, with respect to the initial ruling on the relevance alone, "That is a legal determination and does not involve any exercise of discretion." 314 Md. at 634, 552 A.2d 896.

---

**22.** FRE 401 and Unif.R.Evid. 401 (1974), in turn, tell us what is "relevant," again reflecting settled evidentiary principles:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

See McCormick § 185, at 541–542.

*See also McCormick* § 53, at 137. In the case before us, Judge Brown ruled that the evidence of the two prior convictions was relevant. We agree.

■■■ "Relevance," in its currently accepted broader usage, embodies what were once two separate sub-issues: 1) materiality and 2) "relevance" in its older and narrower usage, now generally called "logical relevance" or probative value. *McCormick* § 185, at 541–542. The "intent to distribute" is most assuredly a material issue in the trial of a defendant for possessing cocaine with intent to distribute. Indeed, without proof of this element, there would be a judgment of acquittal as to the first count. We discussed the materiality of the intent element at some length, in *Anaweck v. State,* 63 Md.App. 239, 255, 492 A.2d 658, 666 (1985):

> "The quantity of narcotics possessed, however, is not an end in itself; it is but evidence of intent. It is the intent itself that is critical. We discussed this very element in *Waller v. State,* 13 Md.App. 615, 618, 284 A.2d 446 (1971), where Judge Powers concluded:
>
> > 'We hold that the legislature, in using the words "in sufficient quantity to reasonably indicate under all circumstances an intent," meant no more and no less than *with intent,* as that phrase is well known in the law.'
> > (Emphasis in original).
>
> Thus, even a large quantity of drugs might not yield a finding of intent to distribute, if other circumstances indicated large private consumption. Conversely, a much smaller ·quantity might yield such finding of intent, if evidence other than the quantity possessed showed that intent."

The second sub-element of "relevance" in its larger, latter-day sense is "logical relevance" or probative value. This would be, in the present context, the tendency of the "other crimes" evidence to make the material issue (intent to distribute) more or less likely. Again, *Anaweck v. State* is instructive, 63 Md.App. at 255, 492 A.2d at 666–667:

"There was in the present case, to be sure, some evidence of an intent to sell arising from the purity and quality of the cocaine, the quantity of the cocaine, and the method of packaging. In none of those three respects, however, was the evidence so overwhelming that a strong defense argument might not have persuaded the jury that the cocaine was for private consumption. Resting on that proof alone, the State—though satisfying its threshold burden of production—still might have failed to persuade a jury unanimously and beyond a reasonable doubt that the possession was, indeed, with intent to distribute or dispense. With the additional evidence of actual sales of cocaine executed by both appellants on the two immediately preceding days, however, the State's burden of persuasion was almost reduced to a 'pat hand.' *How better to prove an intent to sell than to prove that one is in the habit of selling!*" (Emphasis supplied).

Where, as here, the issue of intent is material, the relevancy of evidence of other crimes or bad acts to prove such intent is clear. *McLain* § 404.7, at 358, explains, "In a case where a party must be proved not only to have committed the acts alleged but also to have done them with a certain intent, his or her prior similar acts will be relevant to show intent." (Footnote omitted). The Maryland case law with respect to the relevance of such evidence to prove intent is well settled. *Tull v. State*, 230 Md. 596, 602–603, 188 A.2d 150, 154 (1963); *Bryant v. State*, 207 Md. 565, 586, 115 A.2d 502, 511 (1955); *Lamb v. State*, 66 Md. 285, 287, 7 A. 399, 402 (1886); *Timney v. State*, 80 Md.App. 356, 364, 563 A.2d 1121 (1989); *Tinnen v. State*, 67 Md.App. 93, 97–100, 506 A.2d 656, 658–659 (1986); *Simms v. State*, 39 Md.App. 658, 666–671, 388 A.2d 141, 146–148 (1978); *Avery v. State*, 15 Md.App. 520, 533, 292 A.2d 728, 739 (1972).

The national case law is in full accord. *See, e.g., United States v. Hines*, 717 F.2d 1481, 1488–1489 (4th Cir.1983) (in prosecution for conspiracy to possess cocaine with intent to manufacture and distribute, evidence of both prior and subsequent dealings in both cocaine and marijuana relevant

to prove intent); *United States v. Hitsman,* 604 F.2d 443, 447–448 (5th Cir.1979) (evidence of dealings in marijuana two or three years prior to present crime admissible to prove intent); *United States v. Alejandro,* 527 F.2d 423, 429 (5th Cir.1976) (evidence of earlier narcotics sale admissible to show requisite intent); *United States v. Marchildon,* 519 F.2d 337, 345–346 (8th Cir.1975) (possession of other kinds of drugs admissible to show intent to distribute).

The "other crimes" evidence here offered for the purpose of proving intent was relevant as a matter of law.

### The Counterweights to Relevance

That relevance, however, does not guarantee admissibility. Attention turns to what *McCormick* calls "Relevancy and its Counterweights," Title 7, at 540, a subject dealt with by FRE 403:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

### A. Counterweight # 1: Unfair Prejudice

■ The greatest of these is unfair prejudice. By way of unfair prejudice, there always lurks the danger that the evidence, despite an ostensibly legitimate purpose, may "be used merely as a ruse to accomplish the prohibited objective" of showing propensity. *McLain* § 404.5, at 354. This is why *State v. Faulkner* cautions that "because of the potential danger involved, the admission of other crimes evidence 'should be subjected to rigid scrutiny by the courts.'" 314 Md. at 634, 552 A.2d 896. Chief Judge Murphy described the dangers, in *Straughn v. State,* 297 Md. 329, 333, 465 A.2d 1166, 1168–1169 (1983):

"First, if a jury considers a defendant's prior criminal activity, it may decide to convict and punish him for having a criminal disposition. Second, a jury might infer that because the defendant has committed crimes in the

past, he is more likely to have committed the crime for which he is being tried."

*And see Tichnell v. State,* 287 Md. 695, 711–712, 415 A.2d 830, 839 (1980). *McCormick* § 186, at 549, speaks of the same danger:

"Evidence of the general character of a party or witness almost always has some probative value, but in many situations, the probative value is slight and the potential for prejudice large." (Footnotes omitted).

In the weighing process, however, it is important to note, as FRE 403 carefully phrases it, that what is to be weighed is not prejudice generally but only *unfair* prejudice. This is the danger that the evidence will be used not for the legitimate purpose for which it is offered, even when that has powerful effect, but for the additional and *unfair* purposes of showing criminal propensity and/or creating an emotional bias against the defendant. *McLain* § 403.1, at 298, is instructive as to the difference between prejudice and unfair prejudice:

"The fact that particular evidence prejudices one party or the other, in the sense that it hurts his or her case, is not the undesirable prejudice referred to. For example, an eyewitness' testimony that she saw the defendant shoot the victim may hurt the defendant's chances for an acquittal, but it is not unfairly prejudicial. On the other hand, testimony that the defendant was for five years a member of the 'Hell's Angels' may be unfairly prejudicial, in that it might influence the jury to disregard the evidence or lack of evidence regarding the particular crime with which he is charged. Such evidence is likely to arouse an emotional reaction which might unfairly influence the fact-finder's decision." (Footnotes omitted).

*McLain, id.* n. 9, explains that "unfairly prejudicial evidence has 'an undue tendency to suggest decision on [an] improper basis.' "

In the case at bar, the fact that the defendant had distributed heroin on two prior occasions had a strong

tendency to persuade the jury that he intended to distribute cocaine on the present occasion. That, however, was a proper, albeit strong, basis for decision, not an improper one—prejudice but not unfair prejudice. As *United States v. Figueroa*, 618 F.2d 934, 943 n. 4 (2d Cir.1980), observed, "[T]he Advisory Committee Note to Rule 403 defines 'unfair prejudice' as 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' This makes clear that 'unfair' refers to the degree of prejudice and that 'prejudicial' evidence is not simply all material evidence, nor everything introduced against a defendant." *And see Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir.1977):

> "Of course, 'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'"

Quite aside from the fact that the prejudice in this case was not unfair, we note, moreover, that it was only incremental. It did not operate to prove the appellant guilty of the crime of unlawfully possessing contraband cocaine; he essentially acknowledged that throughout the course of the trial. It only added the aggravating *mens rea* of an intent to distribute. Even in terms of the standard cliche, it did not show that a presumptively good man was a bad man, but only that an admittedly bad one was worse.

### B. *Counterweights # 2 and/or # 3: Confusion and/or Misleading*

Even the academic authorities are not in agreement as to whether 1) confusing the jury and 2) misleading or distracting the jury are separate counterweights or an omnibus counterweight. *Weinstein's Evidence* ¶ 403[04], at 403–24, observes:

> "Few attempts have been made to distinguish between 'confusion' and 'misleading.' McCormick relies upon cases referring to both factors in footnotes supporting his proposition that evidence may be excluded when 'the

probability that the proof and the answering evidence that it provokes may create a side issue that will unduly distract the jury from the main issues.' " (Footnotes omitted).

In a case involving civil or criminal fraud, an effort to prove earlier fraudulent behavior of a highly complicated nature might serve only to confuse the issues in the minds of the jurors. To inject into the case some highly emotional or horrifying earlier misdeed might distract the jury from the case at hand. If in a case involving an earlier bad act that did not result in a criminal conviction, the State offered witnesses to prove its happening and the defendant offered witnesses to disprove the happening, the trial within a trial on a side issue could mislead the jury.

*Weinstein's Evidence* ¶ 403[04], at 403–25 to 26, notes in this regard:

"Courts are also reluctant to admit evidence which is seemingly plausible, persuasive, conclusive and significant if detailed rebuttal evidence or complicated judicial instructions would be required to demonstrate that the evidence actually has little probative value."

Several of the leading cases affirming the discretion of the trial judge in excluding relevant evidence because of its tendency to confuse or to mislead are *United States v. Costello*, 221 F.2d 668 (2d Cir.1955) and *United States v. Bowe*, 360 F.2d 1 (2d Cir.1966). In *United States v. Bowe*, the Second Circuit commented, at 15–16:

"A trial judge has discretion to exclude evidence which is only slightly probative if its introduction would confuse and mislead the jury by focusing its attention on collateral issues and if it would unnecessarily delay the trial.... The rationale underlying this broad grant of discretion is that such a determination necessarily requires the balancing of intangible factors peculiarly within the knowledge of the trial judge.... [I]t is apparent, as the trial judge stated after hearing extensive argument, that the introduction of the proffered testimony would have opened up a trial within a trial. It would not

only have been proper to call witnesses to the alleged conversation in July, 1964 between Teahan and Wood, for purposes of clarifying whether, by whom and in what context the statements were made but other witnesses might have been called for impeachment purposes.... The trial judge correctly concluded that the confusion and delay which would have resulted from the introduction of Teahan's testimony outweighed its slight probative value." (Citations omitted).

In any event, be these separate counterweights or a single counterweight, they are not present in the case before us and do not enter into this weighing process.

## C. *Counterweight #4: The Waste of Time*

In the hierarchy of counterweights, undue delay or waste of time seems clearly to be the least weighty. As was noted in the Advisory Committee Note to FRE 403:

"The case law recognizes that certain circumstances call for the exclusion of evidence which is of unquestioned relevance. These circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to *nothing more harmful than merely wasting time, at the other extreme.*" (Emphasis supplied).

This is a relatively inconsequential counterweight. If the proffered evidence has strong probative value, the court will take whatever time is required to receive it. *Weinstein's Evidence* ¶ 403[06], at 403–40, points out:

"Certainly, Rule 403 does not mean that a court may exclude evidence that will cause delay regardless of its probative value. If the evidence is crucial, the judge would abuse his discretion in excluding it." (Footnote omitted).

Where the probative value of the evidence is slight, however, it is always within the discretion of the trial judge to determine that, in the interest of judicial economy, "the dance is not worth the candle."

██ In the particular context of showing other crimes or bad acts against a criminal defendant, this counterweight is not an issue where the proof of other crimes consists simply of showing convictions. That takes no appreciable time at all. The time factor would only enter into the equation when the prosecution might seek to show other bad acts that never resulted in criminal convictions (perhaps even acquittals) or never even led to arrests. As *Weinstein's Evidence* ¶ 404[10], at 404–56, points out:

> "There is no requirement that the other criminal activity have culminated in a criminal conviction, or even that it has resulted in a criminal charge. All that is required is proof that the defendant was connected to the other offense." (Footnotes omitted).

*Yale Comment*, at 770, similarly describes the open-ended nature of what may be offered as evidence in this regard:

> "Often, however, other crimes evidence may include acquittals for technical reasons, arrests which did not lead to trial, police observations not culminating in arrest, and police or private suspicions often not based on direct observation." (Footnotes omitted).

A contested effort to establish an earlier bad act not resulting in conviction, with witnesses potentially testifying in both directions, could quite literally become a trial within a trial. That would be the type of situation where the counterweight of undue delay or time consumption (and, quite possibly, the counterweights of confusion and/or distraction) would at least call for the trial judge's exercise of discretion.

That is not, however, the situation in the present case where nothing more complicated than the quick and efficient admission of criminal convictions was concerned.

### Reinforcing Relevance

When evidence of other crimes or bad acts is offered against a criminal defendant, there is an added dimension of risk that does not attend the ordinary balancing between

relevancy and its counterweights. Even when probative evidence is offered on a material issue, there lurks the inevitable danger that the evidence, though admitted for a proper purpose, will be used for the prohibited purpose as well.

This is a calculated risk that the law is willing to run when it must. In order to minimize the risk, however, without unduly impeding the State's legitimate efforts to prove its case, the law has surrounded "other crimes" evidence with a *cordon sanitaire* of special requirements calculated to reduce the risk.

This additional safeguard that ordinary relevance must be "beefed up" or reinforced in order to predominate in the weighing process is what *State v. Faulkner* referred to, 314 Md. at 634, 552 A.2d 896, when it admonished that "because of the potential danger involved, the admission of other crimes evidence 'should be subjected to rigid scrutiny by the courts.'" The reinforcing requirements sometimes seek directly to lessen the impact of the potentially prejudicial evidence. Sometimes they seek to guarantee that the risk will only be run when necessary.

In the discretionary weighing process, the trial judge must determine whether, even for a legitimately relevant purpose, the benefit is worth the cost. Thus, if the probative value of the evidence is but slight and the route to a proper purpose attenuated, the "sense" of the trial judge may be that there is not enough to be gained to justify incurring the risk of the improper use of the evidence. This is what *Ross* (and almost all of its progeny) referred to as it quoted from C. McCormick, *Evidence* § 190 (2d ed.1972) that the State may only use such evidence when, in the discretionary judgment of the trial judge, it is "*substantially* relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character.'" 276 Md. at 669, 350 A.2d 680 (Emphasis supplied). A merely theoretical or abstract utility, as opposed to a real or *substan-*

*tial* utility, does not represent much weight in that pan of the balance scales. Under this guideline, the interior judgment as to whether relevance is substantial is not a part of the judge's legal ruling on relevancy but is rather a part of his discretionary ruling on admissibility.

A. *Reinforcement #1: The "Clear and Convincing" Burden*

In its list of directives to the trial court for handling "other crimes" evidence, *State v. Faulkner*, 314 Md. at 634, 552 A.2d 896, points out that immediately after determining that the proffered evidence is relevant for a purpose other than showing propensity:

"[T]he next step is to decide whether the accused's involvement in the other crimes is established by clear and convincing evidence."

 The "clear and convincing" burden, like any burden of persuasion, is directed to the fact finder. In this case, the fact finder is the trial judge who must be persuaded that the defendant committed the other crimes or bad acts. The choice of a burden of persuasion is the way by which the law attempts to communicate to a fact finder that degree of certainty which he should feel in order to find something as a matter of fact. Justice Harlan explained the function of a burden of persuasion, in *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 1075–1076, 25 L.Ed.2d 368, 379 (1970) (concurring opinion by Harlan, J.):

"[A]ll the factfinder can acquire is a belief of what *probably* happened. The intensity of this belief—the degree to which a factfinder is convinced that a given act actually occurred—can, of course, vary. In this regard, a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. Although the phrases 'preponderance of the evidence' and 'proof beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact differ-

ent notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions." (Emphasis in original).

With respect to the burden of persuasion, the role of appellate review is very limited. In the case of an issue of fact submitted to a jury, the appellate court is concerned to see that the trial court properly advised the jury as to which standard of persuasion to employ and that it then properly defined for the jury what that standard is. In the case of an issue of fact submitted to the judge, the appellate court is concerned to see that the trial judge, to the extent he makes us privy to his thought process, employed the proper standard of persuasion. Since decisions as to credibility and weight, however, are in the unfettered prerogative of the fact finder, appellate review, assuming the fact finder is applying the proper standard, is then limited to whether the ultimate fact finding was clearly erroneous. This reduces itself to whether the proponent met the burden of production; to whether the proponent made out a *prima facie* case with respect to the issue; in other words, to whether the evidence was legally sufficient to support the finding of fact.

This is the clear import of *State v. Faulkner*, which, after directing that the trial court shall utilize the "clear and convincing" standard of persuasion, turns to the different issue of appellate review: "We will review this decision to determine *whether the evidence was sufficient* to support the trial judge's finding." 314 Md. at 635, 552 A.2d 896. (Emphasis supplied). Even as the burden of persuasion rises or falls with the choice of an appropriate standard, the test for sufficiency remains constant. As long as the weight to be given the evidence is in the unfettered prerogative of the fact finder, that which is legally sufficient to persuade one fact finder "a little bit" is *ipso facto* legally sufficient to persuade another fact finder "a lot." The choice of a particular burden of persuasion is the way in which the law sends the message to the fact finder that

with respect to a given issue, he should be persuaded a little bit, a lot, or something in between.

■ Specifically with respect to evidence of other crimes and bad acts, the choice of the "clear and convincing" burden of persuasion communicates to the fact-finding trial judge, by way of guiding his exercise of discretion, that he should be persuaded of the existence of those other crimes or bad acts "a lot" and not just "a little bit." The reason for this higher than ordinary burden of persuasion is clear. If all we were concerned with were actual convictions for crime, there would be no problem. Such evidence would be sufficiently unequivocal that the law would be unconcerned with the level of persuasion. Because the State is permitted to show, however, criminal acts that may have resulted in acquittals, criminal acts that were never prosecuted, criminal acts for which an arrest was never made, or even bad acts that did not literally offend the criminal law, the very happening of those acts may be very problematic. If alleged by the State and denied by the defendant, with witnesses ready to testify for or against the occurrence, the fact-finding judge should be strongly persuaded as to the actual happening of the other crimes or bad acts before he permits their introduction into evidence.

In the present case, the burden of persuasion used by Judge Brown was no problem because the proof of the appellant's earlier crimes were his actual convictions for those crimes. Their happening was not even controverted. As *Yale Comment,* at 769–770, points out:

"A prior conviction or plea of guilty establishes the commission of the other crime with a high degree of certainty." (Footnotes omitted).

B. *Reinforcement #2: The Necessity Factor*

After dealing with appellate review of "whether the evidence was sufficient to support the trial judge's finding," *State v. Faulkner* turns to its final reinforcement requirement:

"If this requirement is met, the trial court proceeds to the final step. The necessity for and probative value of the 'other crimes' evidence is to be carefully weighed against any undue prejudice likely to result from its admission.... This segment of the analysis implicates the exercise of the trial court's discretion." (Citation omitted).

314 Md. at 635, 552 A.2d 896.

▇ Because of the ever-present risk that the jury will use the evidence for an improper purpose, the court will take the risk only when it must. If the defendant, for instance, has conceded the intent element, there is no necessity for the State to prove it. *United States v. Webb,* 625 F.2d 709, 710 (5th Cir.1980). If the State's other evidence of the disputed element is so overwhelming that the "other crimes" evidence would be redundant, there is similarly no necessity for running the risk. *Yale Comment,* at 770, discussed the necessity factor:

" 'Probative worth,' however, consists of more than logical relevance or persuasiveness. No matter how persuasive of the fact it is supposed to prove, other crimes evidence has no probative worth if the fact is not in issue. Perhaps the clearest case would be other crimes evidence offered to prove a fact not material to proof of the charged crime—for example, specific intent in a manslaughter trial. Because such evidence does not advance the search for truth, it serves no purpose which might justify whatever prejudice it creates, and is excluded for that reason. A similar situation would exist when the accused concedes the issue to be proved—for example, when he admits committing the act in question and bases his defense on some other grounds." (Footnotes omitted).

On the other hand, the mere fact that the State has with independent evidence established a *prima facie* case of intent is not enough to militate against the reception of the "other crimes" evidence. Although there may no longer be a necessity to meet the burden of production, there remains the necessity to meet the burden of persuasion. *Anaweck*

*v. State* discussed this precise issue, 63 Md.App. at 246–247, 492 A.2d 658:

"A preliminary word on the subject of relevance! Even if it could be said with certainty that the evidence of December 12, standing alone, would have established a legally sufficient, *prima facie* case of guilt as to both appellants, that would not dissipate the State's legitimate need for additional relevant evidence. Relevant evidence is necessary not only to meet the threshold burden of production, but also to meet the far greater burden of ultimate persuasion. All evidence beyond that barely minimal amount that represents legal sufficiency will not be deemed redundant. When the State sufficiently satisfies its initial burden of production, its real task is not finished, but only begun. In the context of this case, the evidence of December 12 managed to clear the directed verdict hurdle but might still, in all likelihood, have failed to persuade 43 out of 50 juries of guilt beyond a reasonable doubt. Relevant evidence serves a vital function in helping the State satisfy not only its burden of production, but also its burden of persuasion."

 In the present case, the State clearly had a need for the "other crimes" evidence. The intent element was not only in serious dispute but was, indeed, the only thing in dispute. Although the quantity of cocaine involved was reasonably significant, it was not classically packaged for distribution. Nor was there an actual sale in this case. The entire thrust of the defense, moreover, was to concede possession and to try to persuade the jury that the cocaine was for the appellant's own private consumption. The need for the evidence was clear.

C. *Reinforcement # 3: A Limiting Instruction When Requested*

 Although *State v. Faulkner* does not address this sanitizing requirement, the general law is that a defendant, *upon timely request,* is entitled to a limiting instruction, advising the jury that it is only to use the "other crimes"

evidence for the proper purpose for which it has been admitted and is not to consider it as evidence of the defendant's general propensity toward crime. *McLain* § 404.5, at 355, points out:

"[W]hen evidence of a prior crime is admitted in a criminal case, the court on request must instruct the jury as to the limited purpose for which it may consider the evidence." (Footnote omitted).

In the present case, there was no problem. Judge Brown appropriately advised the jury:

"You have heard evidence in this case that the Defendant was on a prior occasion convicted of a crime of possession of heroin with intent to distribute which is not a charge in this case. You may consider that evidence in connection with all of the other evidence in this case, *but only as it relates to the question of intent.*" (Emphasis supplied).

### The Weighing Process Itself: The Tiebreaker and the Standard of Appellate Review

The weighing process is not at all difficult in this case. For more marginal cases, however, there are guidelines to assist trial courts and appellate courts alike in making the close calls. FRE 403 reflects the general standard that a trial judge "may exclude relevant evidence" if its probative value "is *substantially* outweighed" (emphasis supplied) by the unfair prejudice, etc. *McCormick* § 185, at 547 n. 37, notes the significance of the adverb "substantially" in terms of allocating the burden of proof in the weighing process:

"If the competing factors, measured under this standard, are in equipoise, Rule 403 clearly requires admission, since it cannot then be said that the probative value 'is substantially outweighed.' "

In the present case, Judge Brown ruled that the relevance of the "other crimes" evidence to prove intent was not substantially outweighed by the danger of unfair prejudice, the only counterweight pertinent in this case.

Once the trial judge has engaged in that weighing, moreover, the appellate court extends great deference to that decision. *McLain* § 403.9, at 333, points out, "Because FRE 403 is a rule of discretion, the trial court's decisions applying it may be reversed only on a showing of abuse of discretion. That standard is rarely met." (Footnote omitted). *And see United States v. Lebovitz,* 669 F.2d 894, 901 (3d Cir.1982) ("[S]uch balancing should be performed ... by the trial court who is in the best position to determine the weight to be given the various relevant factors."); *United States v. Long,* 574 F.2d 761, 767 (3d Cir.1978) (trial judge should be given substantial discretion in balancing probative value against prejudice and should not be reversed because appellate court believes it would have decided differently).

That discretion, however, is not absolute and there may be instances of clear abuse. In the analytical framework established by *State v. Faulkner,* it would appear to be at this stage that *Ross v. State* pinpointed the trial error, although *Ross* was far from precise in providing a roadmap through its decisional process. There, the defendant was on trial for the possession of heroin with intent to distribute on February 6, 1973. The defendant had never been convicted of a drug-related crime. The State's witness was an undercover informant who had been convicted of drug-related crimes. The informant testified that he had known the defendant since "around 1958," fifteen years earlier. The only evidence of the defendant's earlier "bad acts" consisted of the following single exchange:

"Q: Would you tell us what, if any, contact you had had with [the appellant] from 1958 up to the date in question, February 6, 1973?

A: We used to work together selling narcotics."

In rejecting the use of this evidence of earlier bad acts, the heart of *Ross*'s reasoning consisted of the following:

"Proof that the accused had previously sold narcotics perhaps as long as 15 years before the crime charged in the indictment hardly tends to establish a disposition or

propensity to commit the offense alleged, let alone an intent to do so."

276 Md. at 671–672, 350 A.2d 680. Several paragraphs later, *Ross* returned to its assessment of the impropriety of receiving this evidence:

"We think the question sought testimony which was too remote and uncertain to have had any effect whatever upon the determination of the issues to be tried."

276 Md. at 672, 350 A.2d 680.

In that discretionary weighing process in *Ross*, there was far less necessity for the evidence than in the present case. In *Ross*, unlike here, there was a controlled $150 "buy" in part witnessed by a plain-clothes detective. In *Ross*, unlike here, the recovered heroin was neatly packaged in 25 glassine bags. In this case, there was a single plastic bag.

In *Ross*, moreover, the evidence had far less probative force than in the present case. Here, the criminal convictions occurred two years and four months and two years and seven months, respectively, before the crime in issue. In *Ross*, the alleged incident may have occurred as much as fifteen years before the crime there in issue. In this case, the evidence was of the highest degree of certainty, actual convictions in a court of law. In *Ross*, the alleged criminal activity, of uncertain date, never even resulted in a criminal charge. The witness to the other criminal act in *Ross* was, furthermore, of dubious credibility, a convicted felon and a paid police informant from the criminal milieu.

By way of yet further distinction, the risk of unfair prejudice was greater in *Ross*. There, the defendant took the stand and denied his criminal agency totally. Here, the criminal agency was essentially conceded and only the aggravating *mens rea* of intent to distribute was in issue. In manifold regards, the cases are vastly dissimilar.

As we review Judge Brown's exercise of discretion, the fact that we think he was correct and that we, in his place, would have done the same thing is beside the point, for that is not the standard of review by which we are

bound. Even if we in his place might have done otherwise, we still could not say that he clearly abused his discretion. Absent such clear abuse, his ruling will, as a matter of course, be affirmed.

### The Search and Seizure Issue

Our response to the appellant's second contention will be in a lower key. The appellant claims that the physical evidence should have been suppressed. We disagree.

On the night of November 21, 1987, Baltimore City Police Officer Samuel Sweet, in uniform, was in a marked police car when he noticed two automobiles travelling at a very high rate of speed on Dolphin Street. He stopped a maroon Ford Taurus containing three passengers. The appellant was the passenger in the back seat. The stop was not improper and the appellant does not contest that fact.

In response to the officer's request, the driver replied that he did not have a driver's license. After fumbling through the glove compartment, the driver could not produce a registration card. Questioned two or three times about who the owner of the car was, the driver failed to give a direct answer. Officer Sweet noticed that the car "looked like a brand new car inside," that it was "nice and clean," and "empty of any items." Suspecting that the car might be stolen, Officer Sweet called for backup. When the backup arrived, Officer Sweet warned them to be careful.

When Officer Sweet looked into the interior of the automobile with a flashlight, he noticed the passenger in the front seat and the appellant in the rear seat, both with their hands down between their legs. The two passengers were ordered to alight from the car. This action was also proper. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

In the meantime, the officers were not able to ascertain whether the car was stolen because the police department's computers were not operating. Officer Sweet's attempt to

locate registration documents in the glove compartment was unavailing.

■ It was Officer Richard Sprouse who subjected the appellant to "a routine pat-down ... to see if he had anything on him, weapons or anything like that." Just prior to the frisk, the appellant "kept going for his right breast pocket, kept putting his hand up there," despite the fact that he had been ordered to keep his hands on the trunk of the car. There was clearly articulable suspicion for the frisk. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

■ In the course of frisking the appellant, Officer Sprouse felt something very hard in the right breast pocket and took it out. It was a plastic bag with "a large white heavy-duty substance inside of it." Officer Sprouse also recovered a handgun from the appellant's right front pocket. We see no error.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.